Esther MARCUS, et al.,
Plaintiffs–Appellees,

v.

Louis V. SULLIVAN, M.D., Secretary
of Health and Human Services,
Defendant–Appellant.

No. 89–2717.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 19, 1990.

Decided Feb. 21, 1991.

Steven Coursey, John M. Bouman, Mary E. Kopko, Martha Tonn, David Yen, Legal Assistance Foundation of Chicago, Chicago, Ill., for plaintiffs-appellees.

Mary S. Rigdon, Nancy K. Needles, Asst. U.S. Attys., Civ. Div., Appellate Section, Chicago, Ill., John F. Cordes, Jr., Matthew M. Collette, Dept. of Justice, Civ. Div., Appellate Section, Washington, D.C., for defendant-appellant.

Before CUMMINGS, CUDAHY and COFFEY, Circuit Judges.

CUMMINGS, Circuit Judge.

Plaintiffs-appellees represent a class of widows, widowers and surviving divorced spouses ("spouses") who claim disability benefits under 42 U.S.C. § 402 of Title II of the Social Security Act ("Act") and children who claim disability benefits under the Supplemental Security Income ("SSI") program of Title XVI of the Act. These claimants argued below that the Secretary of Health

and Human Services ("Secretary") violates the Act by denying disability benefits without first assessing each claimant's individual functional capacities. "Functional capacity" is most succinctly defined as what one can do despite one's physical and mental limitations. On plaintiffs' motion for summary judgment, the district court invalidated the Secretary's practice of denying benefits to children and spouses solely upon a finding that his or her impairments do not meet the Secretary's listing of about 120 *per se* disabling impairments. The Supreme Court subsequently invalidated the Secretary's methodology with respect to children in *Sullivan v. Zebley*, 493 U.S. 521, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990), resolving the precise issue raised by child claimants in this case. Remaining for this Court to consider is the validity of the Secretary's practice with respect to spouses. Also, certain class composition issues which are relevant to both spouses and children in the suit are still at issue.

We affirm the district court's final judgment order in all respects.

## I. The Regulatory Framework for Spouses' Benefits

Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*, provides social security insurance benefits to disabled wage earners and disabled widows, widowers and surviving divorced spouses. When Congress first made spouses eligible to receive benefits through 1967 Amendments to the Act, it set a stricter definition of "disability" for spouses than for wage earners. A wage earner can qualify for benefits by demonstrating that he or she (hereinafter "he" for simplicity) is unable to participate in "any substantial gainful work," 42 U.S.C. § 423(d)(2)(A). A spouse must show that he cannot engage in "any gainful activity." 42 U.S.C. § 423(d)(2)(B).

Because the test of disability is more restrictive for spouses, the process by which the Secretary evaluates spouses differs from that used to evaluate wage earners. Wage earners are put through a five-step sequential inquiry. 20 CFR §§ 404.-1520, 416.920 (1990). Step one eliminates those who are still in the workforce. 20 CFR §§ 404.1520(b), 416.920(b). Step two disqualifies claimants who do not have a "severe" impairment. §§ 404.1520(c), 416.-920(c). In the third step, the impairments of the claimant are compared to a listing ("Listing") of about 120 medical conditions which the Secretary concedes are severe enough to prevent a person from engaging in any gainful activity. §§ 404.1520(d), 416.920(d), 416.925(a). If the wage earner's impairments meet or equal a listed impairment, the wage earner is conclusively determined to be disabled. §§ 404.-1520(d), 416.920(d). If the wage earner fails to establish equivalence, however, the inquiry is not over. In step four, the Secretary considers whether the impairment prevents the claimant from performing work he has performed in the past. If the claimant can, he is disqualified. §§ 404.1520(e), 416.920(e). Finally, in step five the Secretary asks whether the claimant is able to perform other work in the national economy in view of his age, education and work experience. The claimant is entitled to benefits only if he cannot perform other work. §§ 404.1520(f), 416.920(f).

For spouses of wage earners, step three is the final step of the sequential analysis. Because the Listing correlates to the "any gainful activity" standard of disability set for spouses, a spouse must meet the Listing to qualify for benefits. The Senate report accompanying the bill extending benefits to spouses specified that "individuals whose impairments do not meet th[e] level of severity [represented by the Listing] may not in any case be found disabled." S.Rep. No. 90–744, 90th Cong. 49–50, 1st Sess. *reprinted in* 1967 U.S.Code Cong. & Admin.News 2834, 2883 [hereinafter Senate Report]. Congress envisioned that determinations of eligibility for spouses would be "made without regard to nonmedical factors such as age, education and work experience, which are considered in disabled worker cases" in steps four and five of the sequential analysis. *Id.*

The question presented is whether the methodology used by the Secretary at step three to determine if a spouse meets the Listing adequately gives effect to the Act's

statutory mandate. The Act states that disabled spouses will be separated from non-disabled spouses by the following standard:

A widow, surviving divorced wife, widower, or surviving divorced husband shall not be determined to be under a disability * * * unless his or her physical or mental impairment or impairments are of a level of severity which under regulations prescribed by the Secretary is deemed to be sufficient to preclude an individual from engaging in any gainful activity. 42 U.S.C. § 423(d)(2)(B).

The statute clearly grants the Secretary the right to promulgate the contents of the Listing and thus to determine the level of severity which presumptively renders a spouse disabled. Put another way, the Secretary can set some objective level of impairment which can be "deemed" to preclude some average individual from any gainful activity. The parties agree on this point. Less clear is the extent of the Secretary's responsibility to determine the claimant's individual level of impairment before comparing that claimant's impairments with the Listing. The parties dispute the quality of the comparison needed to support any determination that the claimant is precluded from "any substantial activity."

The regulations and rulings promulgated by the Secretary to govern the comparison of an individual's impairments with the Listing take a restrictive view of the need to assess the individual's condition. The Secretary takes the medical findings presented by the claimant, his signs, symptoms and laboratory findings, and tries to match them to the medical findings of each of the impairments contained in the limited Listing. 20 CFR § 404.1526(c). He only finds a claimant eligible for benefits if his impairment "has *specific clinical findings that are the same* as those for any impairment in the Listing * * * *or are medically equivalent* to those for any impairment

shown there." 20 CFR § 404.1578(a)(1) (emphasis supplied). "Medical equivalence" is defined narrowly:

An impairment "meets" a listed condition * * * only when it manifests the specific findings described in the set of medical criteria for that listed impairment * * *. The level of severity in any particular listing section is depicted by the *given set* of findings and not by the degree of severity of any single medical finding—no matter to what extent that finding may exceed the listed value.

Social Security Ruling 83–19 (emphasis in original).

As the district court observed, SSR 83–19 [1] establishes a "pigeonholing" process in which only a claimant's medical findings are matched. Functional factors which might indicate the severity of the claimant's impairment or combination of impairments are not evaluated. A claimant with a listed impairment who manifests only some findings cannot qualify for benefits, even if impairment is severe as a result of one symptom, for example. "[I]ntensity of a symptom cannot be substituted, no matter how severe * * * to elevate impairment severity to equivalency." SSR 88–13. When a claimant's impairment is unlisted, his medical findings must meet all of the findings for the closest listed ailment in order to "meet" the listing. SSR 83–19. If the claimant has a combination of impairments none of which meet a listed impairment, the medical findings of the combined impairments are compared to the findings of the listed impairment most similar to the individual's most severe impairment. 20 CFR § 404.1526(a). In either a case of single or combined impairments, a claimant cannot show medical equivalence by showing the overall functional impact of his unlisted impairment or combination of impairments. "The functional consequences of the impairments * * * irrespective of their nature or extent, *cannot* justify a

---

**1.** Social Security Rulings are agency rulings "published under the authority of the Commissioner of Social Security and are binding on all components of the Administration." 20 CFR § 422.408 (1990). The Secretary rescinded Social Security Ruling 83–19 as it applied to child claimants after the Supreme Court decision in *Zebley,* but he concedes that the rescission did not affect the ruling's continuing application to spouses. (Br. 9 n. 2.)

determination of equivalence." SSR 83–19 (emphasis in original).

The Secretary concedes that his insistence on an equivalence of medical findings results in the denial of benefits to any spouse whose laboratory findings or symptoms would not disable the "typical" person, even if the individual claimant might in fact be disabled by his impairment. (Br. 25.) He argues that some level of "arbitrariness" is sanctioned by the language of Section 423(d)(2)(B).

The plaintiff class attacks the objective approach taken by the Secretary, feeling that the statute requires an individualized functional assessment of each claimant's impairments. Residual functional capacity ("RFC") is defined by the Secretary as a:

> medical assessment of what an individual can do in a work setting in spite of the functional limitations and environmental restrictions imposed by all of his or her medically determinable impairment(s). SSR 83–10.

As the district court put it, RFC measures "functional ability to stand, sit, follow instructions, lift or accomplish other of the tasks which may be necessary to engage in gainful activity." *Marcus v. Bowen*, 696 F.Supp. 364, 368 (N.D.Ill.1988); see also 20 CFR § 404.1545(b). It is a "medical assessment" which combines a consideration of the demands of a workplace setting and the claimant's physical and mental capacity. *Davidson v. Secretary*, 912 F.2d 1246, 1253 (10th Cir.1990).

At present the Secretary performs an RFC assessment only for wage earners at steps four and five of their sequential analysis. A wage earner who does not establish that his impairment is medically equivalent to the Listing nonetheless may qualify for benefits because the Secretary goes on to consider the claimant's RFC and certain vocational factors (age, education and work experience) in order to determine what work the claimant might be able to do despite his impairment. 20 CFR § 404.1520(e) and (f).

The question before us is whether an RFC analysis is similarly required for a spouse who claims disability benefits. The statute's legislative history unambiguously states that a consideration of vocational factors is not allowed for those claiming spouses' benefits, and the exclusion of vocational factors is not at issue in this case. We take up an examination of the statute and its history to determine if an RFC analysis is required when a spouse claims disability benefits under the Act.

## II. The Validity of the Secretary's Methodology

■ Because the Act expressly grants the Secretary rule-making authority, our review is limited to determining whether the Secretary's rules and regulations are based on a permissible construction of the statute. The Act authorizes the Secretary to adopt "reasonable and proper rules and regulations to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same * * *." 42 U.S.C. § 405(a). Additionally, as discussed above, Section 423(d)(2)(B) grants the Secretary the power to promulgate the listing which is at issue in this case. In these circumstances,[2] the Secretary's interpretation of the statute will not be disturbed unless it is "arbitrary, capricious, or manifestly contrary to the statute." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694.

■ The Secretary's methodology which forbids a consideration of a spouse's RFC in determining medical equivalence is contrary to Section 423(d)(2)(B), which requires

---

2. We disagree with the portion of the district court order stating that the Secretary's interpretation of the Act is not entitled to deferential review. *Doe v. Reivitz*, 830 F.2d 1441 (7th Cir. 1987), amended, 842 F.2d 194 (7th Cir.1988), cited by the court below, is inapposite. *Doe* held that interpretive rules are not entitled to the same degree of deference as legislative rules.

Regulations and rulings like those at issue in this case are legislative, however, and were treated as such by the Supreme Court in *Zebley*. 110 S.Ct. at 890. Deference to the agency is thus appropriate. Nevertheless, for the reasons that follow, we conclude that the Secretary's methodology does not comport with the demands of Section 423(d)(2)(B).

that benefits be awarded to a claimant unable to engage in "any gainful activity." In so holding, we concur in the view of the First, Second, Third, Ninth and Tenth Circuits. See *Cassas v. Secretary*, 893 F.2d 454, 458 (1st Cir.1990) ("residual functional capacity cannot be ignored in considering medical equivalence and, ultimately, disability"); *Kier v. Sullivan*, 888 F.2d 244, 247 (2nd Cir.1989) (Social Security Ruling 83–19 conflicts with the language of 42 U.S.C. § 423(d)(1)(A) and (d)(2)(B)); *Finkelstein v. Sullivan*, 924 F.2d 483, 489 (3rd Cir.1991) ("the Secretary must medically evaluate the widow's residual functional capacity to determine whether her condition * * * equals the level of severity of one of the Secretary's listed impairments"); *Ruff v. Sullivan*, 907 F.2d 915, 916 (9th Cir.1990) ("[T]he Secretary is required to consider residual functional capacity in determining whether a wage earner's surviving spouse's disability is medically equivalent to a listed impairment."); *Davidson v. Secretary*, 912 F.2d at 1253–1254 ("If the widow's disability benefits claimant * * * does not meet or equal a description contained in the listings, the Secretary must necessarily consider the RFC implications of the claimant's medical condition"). The Fourth Circuit has required an individualized assessment of a claimant's RFC when the spouse has a combination of ailments, but not when the spouse has a single affliction that fails to meet the Listing. *Bennett v. Sullivan*, 917 F.2d 157 (4th Cir. 1990).

The language of Section 423(d)(2)(B) itself indicates that a determination of the individual's impairments and functional capabilities must supplement any mechanical comparison of medical findings with the Listing. The Section specifies that a spouse may not be found disabled unless "his or her physical or mental impairment or impairments" are of the level of severity the Secretary deems disabling. The Secretary thus must evaluate an individual's impairment, or combination of impairments, before making a comparison to objective standards of impairment established by the Secretary. Moreover, the incorporation of an "any gainful activity" standard suggests that the level of severity of one's impairment is to be measured with reference to functional requirements of the workplace.

This reading of Section 423(d)(2)(B) comports with the Act's overall functional approach to disability. The Supreme Court has recognized that the Act "generally defines 'disability' in terms of an individualized, functional inquiry into the effect of medical problems on a person's ability to work." *Sullivan v. Zebley*, 110 S.Ct. at 890; *Heckler v. Campbell*, 461 U.S. 458, 459–460, 103 S.Ct. 1952, 1953–1954, 76 L.Ed.2d 66 (The Act "defines 'disability' in terms of the effect a physical or mental impairment has on a person's ability to function in the workplace"). In the 1984 Amendments, Congress re-emphasized the importance of functional impairment in evaluating disability. Congress directed the Secretary to "consider the combined impact of the impairments * * * throughout the disability determination process" for wage earners, spouses and children. 42 U.S.C. § 423(d)(2)(C). It explicitly required that the Secretary perform a realistic assessment of functional limitations for all claimants with combinations of impairments.

The legislative history of the Listing and Section 423(d)(2)(B) also reveals that Congress contemplated an individualized inquiry into functional impairment for spouses claiming disability benefits. The district court carefully examined the history of the Listing, beginning with reports on the "medical guides" first proposed in 1959 as an aid for determining wage earners' benefits. It concluded that because the Listing was never intended to be used as a basis for denial of disability benefits, it would be inconsistent with Congress' intent to construe the Listing as an exhaustive list of the sets of medical findings that qualify a claimant for spouses' benefits. *Marcus*, 696 F.Supp. at 378. The district court found from its review of the relevant history what is apparent when reading the Listing today: that the Listing was only meant to identify clear-cut cases and to catalog the more common disabling conditions. Nothing in the legislative history suggests

that the Listing was to be used to deny benefits to claimants whose level of functional impairment has never been assessed.

The Secretary agrees that the Listing, as originally formulated, did not aim to disqualify wage earners from collecting disability benefits. The Secretary argues, however, that Congress meant the Listing to apply more strictly to spouses than to wage earners. The Secretary maintains that when Congress first created the spouses' disability benefits program in 1967, it intended that the same Listing already used to identify wage earners who automatically qualified for benefits should also be used automatically to disqualify spouses applying for benefits. The Secretary believes that the language of Section 423(d)(2)(B), drafted in 1967, and the Congressional commentary thereon, approve his "medical equivalence" approach. In his opinion, the setting of a higher standard of disability for spouses (the "any gainful activity" standard) endorses his refusal to perform an RFC analysis for spouses.

The 1967 Amendments did not eliminate the Secretary's obligation to conduct individualized functional assessments for disability claimants in cases involving spouses. The higher "any gainful activity" standard explicitly excused the Secretary only from considering vocational factors. The Senate Report accompanying the 1967 Amendments stated that the test of disability for spouses:

> is somewhat more restrictive than that for disabled workers and childhood disability beneficiaries. The determination of disability in the case of a widow or widower would be based solely on the level of severity of the impairment. *Determinations in disabled widow and widower cases would be made without regard to nonmedical factors such as age, education, and work experience, which are considered in disabled worker cases.* Senate Report at 1967 U.S. Code Cong. & Admin.News 2883 (emphasis supplied).

By restricting the definition of disability for spouses, Congress intended to eliminate the consideration of the vocational factors of age, education and work experience.

Nothing in the 1967 Amendments indicates that Congress meant to restrict the use of an RFC analysis. Indeed, "the very exclusion of these factors [age, education and work experience], * * * strongly suggests that the other factor—residual functional capacity—is to be considered." *Kier*, 888 F.2d at 247. The primary goal of the 1967 Amendments was to increase reliance on medical evaluations in establishing the claimant's "disability." The House Committee desired that "more precise guidelines * * * be used in determining the degree of disability" and that "statements of the applicant or conclusions by others with respect to the nature or extent of impairment" be excluded from the Secretary's consideration. H.Rep. No. 544, 90th Cong., 1st Sess. 28–30 (1967). The Secretary acknowledges that an RFC analysis is a medical assessment, made by medical or psychological professionals, of the claimant's impairment. 20 CFR § 404.1546. Congress' purpose in 1967 was actually to foster the use of medical assessments like an RFC analysis.

The 1967 Amendments also did not change Congress' original understanding that the Listing represents a non-exhaustive sampling of impairments. Congress continued to believe that the Listing created a conclusive presumption of disability. In discussing the use of the Listing in wage-earner cases, the Senate noted:

> *In most cases* the decision that an individual is disabled can be made solely on the basis of an impairment, or impairments, which are of a level of severity presumed (under administrative rules) to be sufficient so that * * * it may be presumed that the person is unable to [engage in substantial gainful activity] because of the impairment or impairments. Senate Report at 1967 U.S.Code Cong. & Admin.News 2883 (emphasis supplied).

At the time Congress added spouses' benefits to the Act, it continued to believe that the "level of severity" set by the Secretary

in the Listing could not be conclusive in 100% of the cases.

The Supreme Court recently has disapproved the practice of using the Listing, which is meant to create a presumption of disability, as a catalog which presumptively can disqualify claimants for disability benefits. *Sullivan v. Zebley,* 493 U.S. 521, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990), involved the proper interpretation of 42 U.S.C. § 1382c(a)(3)(A), which provides that a child is disabled "if he suffers from any ... impairment of comparable severity" to one which would make an adult incapable of "substantial gainful activity." The Court struck down the Secretary's practice of denying a child benefits if he failed to prove an impairment "medically equivalent" to the adult Listing. The Court noted four shortcomings of the Listing as applied to child claimants:

> First, the listings obviously do not cover all illnesses and abnormalities that actually can be disabling.

> \* \* \* \* \* \*

> Second, even those medical conditions that are covered in the listings are defined by criteria setting a higher level of severity than the statutory standard \* \* \*.

> \* \* \* \* \* \*

> Third, the listings also exclude any claimant whose impairment would not prevent any and all persons from doing any kind of work, but which actually precludes the particular claimant from working, given its actual effects on him—such as pain, consequences of medication, and other symptoms that vary greatly with the individual \* \* \*.

> \* \* \* \* \* \*

> Fourth, the equivalence analysis excludes claimants who have unlisted impairments, or combinations of impairments, that do not fulfill all the criteria for any one listed impairment.

110 S.Ct. at 893. For these reasons the Court held that the Secretary could not conclude that a child's impairment was not "medically equivalent" to that of the List-ing without first performing an RFC analysis.

The Secretary argues that the Supreme Court disapproved the use of the Listing to disqualify child claimants solely because the child disability standard is linked to the "substantial gainful activity" standard for wage earners rather than the stricter "any gainful activity" standard for spouses. The Supreme Court pointed out in *Zebley* that the linked child and wage-earner disability standards are each more liberal than the disability standard for spouses. 110 S.Ct. at 895. The Secretary believes that *Zebley* is distinguishable from this case for that reason. He argues further that this Court must preclude an RFC analysis for spouses in order to maintain the distinction in disability standards for wage earners and spouses created by the statute and recognized by the Supreme Court.

*Zebley* remains persuasive despite the Secretary's protestations. The difference in the disability standards set for spouses and children is relevant to only one of the four shortcomings of the Listing identified by the Supreme Court. The second failing identified by the Court was that even a child with a listed medical ailment will wrongfully be denied benefits under the Secretary's approach, because the Listing is calibrated to medical findings which preclude "any gainful activity," though children should qualify if they are precluded from "substantial gainful activity." In the case where the child's impairment is listed, but at a different and higher level of severity, obviously the difference between statutory disability standards is relevant. However, the Court's other complaints about the Listing derive not from the higher level of severity at which the Secretary set the Listing, but the notion of using any non-exhaustive Listing to deny benefits, regardless of the severity level at which that listing is set. When claimants present unlisted impairments, or combined impairments, or unusually severe symptoms or pain, any mechanical comparison to the Listing will fall short, since the Listing cannot "exhaust the entire universe of incapacities." *Kier,* 888 F.2d at 458. To remedy this, the Supreme Court mandated that

an RFC analysis be performed on each child claimant as a supplement to the "medical equivalence" methodology.

We conclude from *Zebley* and the legislative history of the Act that the Listing cannot appropriately be used to disqualify a claimant for spouses' benefits in the absence of an individualized RFC analysis. The Secretary can promulgate a Listing, because he is specifically empowered to set that objective "level of severity" which can be "deemed" to preclude an average individual from engaging in "any gainful activity." The Secretary can, and indeed must, exclude a consideration of the vocational factors of age, education and work experience when determining a spouse's disability so as to honor the difference in the statutory definitions of disability for spouses and wage earners. What the Secretary cannot do is deny benefits to an individual spouse simply because his impairment would not "typically" disable a person. This use of the Listing was not one contemplated by Congress nor supported by the language of the Act. Section 423(d)(2)(B) requires a determination that a claimant cannot engage in "any gainful activity," and the Secretary must consider the claimant's functional impairments to make that determination.

We are mindful that "the need for efficiency is self-evident" in processing applications for disability benefits. *Califano v. Boles*, 443 U.S. 282, 284, 99 S.Ct. 2767, 2769, 61 L.Ed.2d 541. However, requiring the Secretary to perform individualized assessments of spouses applying for disability benefits will not unduly tax the Secretary's department. First, functional assessments can be done. The Secretary himself admits that "functional assessment * * * is possible, in that some of his own listings are defined in terms of functional criteria." *Zebley*, 110 S.Ct. at 896. Also, the effect of our holding will be limited. Congress recently amended the Act so that spouses applying for disability benefits are now governed by the same "substantial gainful activity" standard that has always governed wage-earner applicants. Omnibus Budget Reconciliation Act of 1990, P.L. 101–508, § 5103, 104 Stat. 1388 (1990). As of January 1991, claimants for spouses' benefits have been entitled to the same five-step procedure used to evaluate wage-earner applications. Our holding today only requires that class members receive a functional assessment like one which current applicants for spouses' benefits are entitled to receive under the recent amendment to the Act.

## III. Scope of Relief

The Secretary takes issue with the scope of relief granted by the district court. He argues that the district court mistakenly included in the class of spouses and children entitled to relief: 1) claimants who could have exhausted their administrative remedies after the filing of this suit but failed to do so; and 2) claimants who filed their own lawsuits in federal court and were denied benefits after judicial review. In addition, he believes that the district court improperly ordered a re-determination of each claimant's eligibility for benefits up to the date of the court order rather than the date of the original denial of benefits. We address the Secretary's arguments in turn.

### A. *Waiver of Exhaustion.*

Under 42 U.S.C. § 405(g), a plaintiff must obtain a final decision from the Secretary before seeking federal court review of the Secretary's determination. That section provides, in pertinent part:

> Any individual, *after any final decision of the Secretary * * * may obtain a re*view of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision. 42 U.S.C. § 405(g) (emphasis supplied).

A decision by the Secretary is "final" only after the plaintiff files a claim with the Secretary and exhausts the Secretary's three-tier administrative appeal process.[3]

---

**3.** An initial disability determination is made by a state agency acting under the supervision of the Secretary. If the claim is denied, the claim-

ant is entitled to a *de novo* review from the agency. 20 CFR §§ 404.909(a)(1), 416.1409(a). If the claim is denied a second time, the claim-

All claimants filed claims with the Secretary in this case. However, included within the class were some claimants who failed to exhaust their administrative appeals. These claimants allowed the time for challenges within the administrative appeals process to run out during the pendency of this class action. A court can waive the exhaustion requirement, since it is not jurisdictional in nature. *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522. The Secretary argues that waiver was improperly granted by the district court in this case.

We recently examined some of the principles governing waiver of exhaustion in *Johnson v. Sullivan*, 922 F.2d 346 (1990), in which this Court invalidated the Secretary's practice of refusing to consider combined effects of impairments at step two of the disability evaluation process. In *Johnson* itself, we held that the exhaustion requirement could not be waived with respect to a portion of the class, but we distinguished two types of exhaustion problems. Claimants for disability benefits have 60 days to appeal within the administrative process. Some claimants in the *Johnson* class had allowed their 60-day administrative appeals period to expire before the district court action was filed. Others had time remaining in the 60-day administrative appeals period when the district court action was commenced. For convenience, we refer to the two categories of claimants as those having "lapsed" and "live" claims respectively.

 In *Johnson*, a unanimous court sitting *en banc* held that:

> [C]laimants who allowed the time for challenging within the administrative scheme the denial of their benefits * * * to lapse before the class action suit was filed are barred from participating in the action. * * * Those claimants who exhausted their remedies, as well as those claimants who still had an opportunity to

do so at the time the class action was filed, remain in the plaintiff class. 922 F.2d at 355.

*Johnson* thus stands for the proposition that the failure of disability claimants to challenge an illegal procedure of the Secretary within the administrative process cannot be excused when those claimants have allowed the deadline for bringing an administrative appeal to lapse before the class action commenced. On the other hand, those disability claimants whose 60-day administrative appeals period was interrupted by the bringing of the class action can properly be included in the class. The latter group of claimants who were actively pursuing their administrative appeals at the time of the filing of the class action fairly can be allowed to rely on court adjudication of their claims once there is an intervening federal action.

█ Because the plaintiff class in this case includes only claimants with live claims, *Johnson* dictates that waiver of exhaustion is appropriate for all class members. The district court below carefully defined the class to include only those plaintiffs whose "claims were denied initially or on any administrative appeal by a decision on or after November 19, 1984," the date 60 days prior to the filing of the class action. *Marcus v. Sullivan*, No. 85 C 453, 1989 WL 64335 (N.D.Ill. June 12, 1989) (final judgment order). Every member of the plaintiff class in this case thus still had an opportunity to pursue an administrative appeal at the time the class action intervened. These are exactly the same type of plaintiffs for whom we waived the failure to exhaust in *Johnson*.

A three-factor test applies to determine whether plaintiffs with live claims should be excused from a failure to exhaust administrative remedies. This test was not discussed in *Johnson*,[4] but was enunciated by the Supreme Court in *Bowen v. City of New York*, 476 U.S. 467, 482, 106 S.Ct.

---

ant can request a hearing before an administrative law judge with the Bureau of Hearings and Appeals of the Social Security Administration. 42 U.S.C. § 405(b)(1); 20 CFR §§ 404.929, 416.-1429, 422.201 *et seq.* Finally, the claimant can seek review of the administrative law judge's

determination before the Appeals Council. 20 CFR §§ 404.967–404.983, 416.1467–416.1483.

**4.** The test discussed at length in *Johnson* applies only to those plaintiffs with lapsed claims.

2022, 2031, 90 L.Ed.2d 462. The *City of New York* class, like that in *Johnson*, included both plaintiffs with live and lapsed claims. In discussing the claims of those who "still had time to exhaust their administrative remedies," *id.*, the Court noted that waiver of exhaustion is proper only for claims which are collateral to the claim for benefits and only if requiring exhaustion would cause irreparable harm. *Id.* at 483, 106 S.Ct. at 2031 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 330–331, 96 S.Ct. 893, 900–901, 47 L.Ed.2d 18). In addition, the "application of the exhaustion doctrine is 'intensely practical.' " *City of New York*, 476 U.S. at 484, 106 S.Ct. at 2032 (quoting *Eldridge*, 424 U.S. at 331, n. 11, 96 S.Ct. at 901 n. 11). If the purposes of exhaustion, which include allowing the agency to correct its own errors, fostering the compilation of an adequate record, and affording the parties the benefit of the agency's expertise, are not served by requiring class members to exhaust, waiver is favored. *Salfi*, 422 U.S. at 765, 95 S.Ct. at 2466.

Plaintiffs in this case easily meet the requirements for waiver of exhaustion where claimants retain live claims. Claims of system-wide violations by the Secretary are collateral to claims for individual benefits. *Johnson*, 922 F.2d at 353; *Bailey v. Sullivan*, 885 F.2d 52, 65 (3rd Cir.1989). Here, as in *Johnson*, plaintiffs facially challenge an agency policy, and our holding regarding the validity of that policy stands independent of the ultimate merits of each plaintiff's claim for benefits. Even after the new standard of eligibility is applied, some claimants will fail to qualify for disability benefits.

■ Also, plaintiffs will suffer irreparable harm if forced to return to their administrative remedies before seeking court review. The Secretary argues that claimants who are eventually successful in the administrative process can obtain full benefits,

though only retroactively. A delayed receipt of disability benefits, however, cannot suffice to make the claimant whole. *Schweiker v. Chilicky*, 487 U.S. 412, 428, 108 S.Ct. 2460, 2470, 101 L.Ed.2d 370; *Bailey v. Sullivan*, 885 F.2d at 65. Any delay potentially subjects claimants to deteriorating health, and even death. Claimants need to receive funds promptly because they use their benefits to purchase the very necessities of life.

Finally, practical factors favor waiver of the exhaustion requirement. It would have been futile for the district court to require claimants to exhaust administrative remedies in this case, where the Secretary was committed to his policy of disallowing RFC assessments. The record was adequately developed as to the Secretary's policy. In fact he freely admitted it. Also, it is unlikely that he would have corrected his own error on some individual's administrative appeal, given his commitment to, and indeed promulgation of, the improper methodology.

Relying on *City of New York*, the Secretary argues vehemently that in the absence of a clandestine policy, exhaustion is not futile and therefore cannot be waived. Again, drawing a distinction between live and lapsed claims is critical. In *City of New York*, plaintiffs alleged successfully that the Secretary had a secret policy of denying benefits to claimants with mental impairments without assessing their ability to work. It was the existence of a secret, unpublished policy which tipped the scales in favor of: 1) equitable tolling of the 60-day statute of limitations for the bringing of the federal suit, an issue not raised by our case;[5] and 2) waiver of exhaustion for those with lapsed claims. See *City of New York*, 476 U.S. at 482, 106 S.Ct. at 2031 ("For claimants [with lapsed claims], we conclude that exhaustion is excused for the same reasons requiring tolling of the stat-

---

5. In addition to requiring that a "final decision" be obtained from the Secretary, Section 405(g) directs that the federal action be brought within 60 days of that final decision. By waiving plaintiffs' failure to exhaust administrative appeals, we hold that a decision at any administrative appeal level is "final" for Section 405(g)

purposes. Because the class was defined to include only plaintiffs who had received adverse administrative decisions in the 60 days prior to the class action, all class members also meet the requirement that the federal action be brought within 60 days of the final administrative decision.

ute of limitations."). However, in the portion of its opinion discussing live claims, the Court did not demand that a clandestine policy exist as a justification for waiver.

We find persuasive the approach of the Third Circuit in *Bailey v. Sullivan*, 885 F.2d at 52. That court did not find the clandestine policy issue pertinent to its discussion of live claims, *id.* at 65, though it did rely on the existence of a secret policy to exclude from the class those with lapsed claims. It held that those with live claims could properly be included in the class though the Secretary's policy was not secret, and in fact was published for all to see.[6] *Id.*

The district court properly waived the exhaustion requirement for claimants who had opportunities to challenge the agency's determinations at the time the class action was brought. Plaintiffs with live claims meet the only prerequisites for waiver applicable to them. Their claims are collateral, they will be irreparably harmed by further delay, and further pursuit of administrative appeals on their part would be pointless.

### B. *Res Judicata.*

The district court included within the plaintiff class claimants who individually had sought judicial review of adverse administrative decisions and had final judgments entered against them in the courts. Invoking the principles of *res judicata*, the Secretary argues that these individuals should be excluded from the class because each had an obligation to challenge the "medical equivalence" methodology in his

or her individual suit. The Secretary believes that these plaintiffs, because they failed previously to challenge the Secretary's methodology, cannot now obtain redeterminations of their eligibility for benefits on the basis of the district court's order in this case.

■ Had the Secretary properly raised this issue below, we would agree that claimants who obtained final adverse judgments from the courts are not properly included in the class. *Res judicata* bars not only matters that actually were litigated, but also issues that could have been raised. *Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394, 398, 101 S.Ct. 2424, 2427, 69 L.Ed.2d 103; *Bunker Ramo Corp. v. United Business Forms, Inc.*, 713 F.2d 1272, 1277 (7th Cir.1983). Individual claimants who sought review of the Secretary's denial of spouses' disability benefits had a full and fair opportunity to raise the issue of the validity of the Secretary's regulations in conjunction with the other claims they had. As such, their claims ordinarily could not be re-opened here.

■ The Secretary waived an otherwise valid argument, however, by failing to raise the *res judicata* issue below. *Res judicata* is an affirmative defense which, unless raised by the defendant in his answer, is considered waived. Fed.R.Civ.P. 8(c). Defendant did not raise *res judicata* in his answer. He also did not object to the class composition, which from the outset included the subset of plaintiffs at issue now, at any time before the district court initially decided the merits in favor of the

---

**6.** *Pittston Coal Group v. Sebben*, 488 U.S. 105, 109 S.Ct. 414, 102 L.Ed.2d 408, does not aid the Secretary's argument. In *Pittston* the Court refused to order mandamus in a suit for black lung benefits for claimants who had failed to exhaust their administrative remedies or to petition for court review within the 60–day statute of limitations. *Pittston* restated the holding of *City of New York* as follows: "the application of a secret, internal policy by the Secretary * * * in adjudicating Social Security Act claims equitably tolled the limitations periods for seeking administrative or judicial review." *Id.* at 123, 109 S.Ct. at 424. In *Johnson*, this Court held that *Pittston*, together with *City of New York*,

precludes both the equitable tolling of the 60–day statute of limitations for the federal court action and any waiver of the exhaustion requirement for those with lapsed claims. *Johnson*, 922 F.2d at 354. The Court's statement in *Pittston* might seem so broadly worded as to cast doubt on the practice of waiving exhaustion for all administrative appeals, whether lapsed or live, in the absence of a clandestine policy. However, the comment was made in the context of a case involving only lapsed claims, see *Pittston*, 488 U.S. at 112, 109 S.Ct. at 419, and we decline to interpret the Court's statement to mean that waiver is precluded in the absence of a secret policy even if live claims remain.

plaintiffs in September 1988.[7] See *Jimenez v. Weinberger*, 523 F.2d 689, 697 (7th Cir.1975) (requirement of Fed.R.Civ.P. 23(c)(1) that class be certified "as soon as practicable after the commencement of an action" implies disapproval of attempts to amend or alter the class certification order after decision on the merits), certiorari denied, 427 U.S. 912, 96 S.Ct. 3200, 49 L.Ed.2d 1204.

█ The Secretary claims that he did raise the *res judicata* issue prior to the decision on the merits. Six months after the class had been certified, the Secretary moved unsuccessfully to consolidate two individual suits challenging denials of spouses' benefits with this class action. One argument the Secretary made in favor of consolidation was that "litigating the same legal question in two different courtrooms may * * * result in inconsistent decisions." Record at 46, p. 6 (Memorandum in Support of Motion to Consolidate Related Case of *Chandler v. Bowen*); Record at 48, p. 6 (Memorandum in Support of Motion to Consolidate Related Case of *Bryant v. Bowen*).

The Secretary's limited reference to inconsistent judgments did not raise the *res judicata* argument being made to this Court. The Secretary did not explicitly mention *res judicata*. More importantly, the Secretary's comment served simply to warn the district court about future *res judicata* problems which might arise if individual claims were allowed to proceed concurrent with the class action. It did not call the district court's attention to the distinct problem of plaintiffs whose cases had already reached final judgment in the courts and thus should not have been allowed to join the class from the outset. The Secretary's argument now focuses, correctly but tardily, on this latter subset of plaintiffs.[8]

Because the Secretary raised the *res judicata* issue too late, neither the district court nor the plaintiff class had adequate notice of his objection. Accordingly the Secretary waived his *res judicata* defense.

### C. *Period of Re-determination.*

█ The district court's order requires the Secretary to redetermine each class member's eligibility for benefits up to the time the court ordered application of the new standard, rather than the time of the original denial of benefits. This means that even if the original denial of benefits was correct, the Secretary must determine if the claimant became disabled at a later time, even if the claimant never applied again for benefits.

We upheld the propriety of requiring the Secretary to re-determine benefits up to the time a court invalidates a procedure not in conformance with the Act in *Johnson*. 922 F.2d at 355–357. As we pointed out in that case, the Secretary's own regulations establish that any application for benefits remains in effect until some final administrative determination is made. See 20 CFR §§ 404.620, 416.330. The district court vacated prior administrative decisions adverse to the members of the class and ordered re-determinations. Thus final administrative decisions on the claimants' eligibility for benefits have not yet been rendered. Their applications remain in effect. The district court did not err in ordering re-determinations to the date of its order.

### IV. Conclusion

We agree with the district court that under the Act the Secretary cannot deny disability benefits to a spouse without first considering his or her residual functional capacity. There is no merit in the Secre-

---

**7.** The district court's order of September 1988 was later vacated to allow the plaintiff class to propose an order for class-wide relief. The Secretary first raised the *res judicata* issue in January 1989 in his Objections to Plaintiffs' Proposed Order for Relief (Record at 111).

**8.** The gravamen of the Secretary's complaint is that the class was never properly defined, be-cause it included those whose claims had reached judgment prior to commencement of the class action. In the relevant argument heading the Secretary states, "The District Court exceeded its authority by including within the class those claimants who sought judicial review individually and obtained final adverse judgments." (Br. at 46).

tary's challenges to the composition of the class and the scope of relief granted by the district court.

For the foregoing reasons, the order of the district court is affirmed.