Robert PULLIAM, Plaintiff,

v.

Louis SULLIVAN, M.D., Defendant.

No. 90 C 6719.

United States District Court,
N.D. Illinois, E.D.

July 9, 1991.

Frederick J. Daley, Chicago, Ill., for plaintiff.

John S. Brennan, Asst. U.S. Atty., Chicago, Ill., for defendant.

### MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Robert Pulliam ("Pulliam") seeks judicial review of a final decision of Secretary of Health and Human Services Louis Sullivan ("Secretary") denying Pulliam's claim for supplemental security income ("SSI") under the Social Security Act ("Act"), 42 U.S.C. §§ 1381a and 1382(a).[1] Both parties have filed motions for summary judgment pursuant to Fed.R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, Pulliam's motion is denied and Secretary's is granted.

---

**1.** All further statutory references will take the form "Section —," using the Title 42 numbering rather than the Act's internal numbering. Provisions of 20 C.F.R. Part 404 will be cited "Reg. § —," omitting the "404" prefix, while other provisions of 20 C.F.R. will also be cited "Reg. § —," but will include the full section numbering.

## Facts [2]

### Personal History

Pulliam, born on March 6, 1936, has an eleventh grade education and completed two years of music school. Although he has held various jobs, his past relevant work for the purposes of this case was as a saxophonist.

Pulliam stopped working in 1982 at the age of 46 after he was hospitalized for a cerebrovascular accident—a stroke that left his right arm and hand weak. Right-handed before his stroke, Pulliam thereafter learned to use his left hand for most activities. Pulliam testified that his right hand becomes functional after three to four hours each morning, but even then it remains weak and uncoordinated. He can use his right hand to eat and sign his name but needs the assistance of his left hand to grip other than small objects.

Pulliam further testified that he can sit for about two hours, stand for about 20 minutes and lift only 5 pounds with his right hand. He takes care of his own apartment and most of his personal needs.

### Medical Evidence

Pulliam was hospitalized on November 27, 1982 with complaints of weakness on the right side of his body. Findings from a brain scan suggested a recent acute left cerebral infarct [3] that left him with difficulties in the use of his right upper extremity. His discharge diagnosis was electrolyte imbalance and essential hypertension. In December 1985 Pulliam was hospitalized again due to a cerebral concussion and laceration of the right side of the head.[4]

Off and on Dr. Henry Tabe has treated Pulliam for various ailments. On April 15, 1988 Dr. Tabe diagnosed Pulliam as having hypertension as well as an inactive peptic ulcer disease. He noted that Pulliam did not complain of joint pain on that visit, and Dr. Tabe's physical examination of Pulliam did not disclose a current arthritic condition of a significantly restrictive nature. Dr. Tabe reported that Pulliam was able to "walk independently as well as use arms, hands, and legs in an adequate manner" (R. 255).

On October 12, 1988 Pulliam was evaluated by Dr. Leonard Weiss, a consultative internist. Dr. Weiss' clinical impressions were (R. 249):

1. Cerebrovascular Accident by History with only Sequela Mild Weakness in Right Hand.
2. Abdominal Pain by History.
3. Multiple Arthralgias. Normal musculoskeletal exam today.

As for the third impression, Dr. Weiss stated that there was a full range of motion in all joints examined and normal motor strength in all joints except for the right hand, which was 4/5. Dr. Weiss added (*id.*):

The patient walked well. His ability to bear weight is good and he does not need a cane. He can grasp, finger and manipulate with each hand. He is right hand dominant. Black-outs ... were secondary to alcoholism historically without neurological deficit. There are no focal neurological deficits today except for right hand problem secondary to cerebrovascular accident in 1982. He was oriented, had good memory, appearance and behavior and he related well during the exam. He is capable of handling his funds in his own interest.

On July 28, 1989 Dr. Irving Sherman evaluated Pulliam at the request of Pulliam's attorney. Dr. Sherman reviewed

---

2. All the facts set out here are not in dispute, obviating the need for this Court to preoccupy itself with the sometimes difficult task of adopting a Janus-like set of dual perspectives on cross-motions for summary judgment (see *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991), requiring courts to draw "those inferences that are reasonable" in the light most favorable to each nonmovant). Citations to the Administrative Record will take the form "R. —."

3. Defined by *Stedman's Medical Dictionary* 706, 929 (5th Lawyers' ed. 1982) as a sudden insufficiency of blood supply that produces irreversible damage to tissue cells in the brain.

4. Pulliam contends that he fell and hit his head, while the hospital reports say that he was attacked and hit in the head with a piece of wood. Although the parties contest the events surrounding the injury, the dispute is not material.

Pulliam's medical history, including the examination by Dr. Weiss, about which Dr. Sherman had "the impression that it was a rather skimpy examination and I would not trust the details" (R. 279). Dr. Sherman stated (R. 280–81) that Pulliam's current problems revolved around (1) back pain for 20 years that caused him difficulty in walking and for which he was given pills, (2) arthritis in his knees, feet, shoulders and right hand, for which he takes Ibuprofen, (3) the stroke in 1982 that left his right upper extremity weak and (4) blackouts starting in about January 1986 and happening two or three times a year.

Dr. Sherman refused to opine about Pulliam's arthritis because he has no expertise on that subject, but he concluded (R. 282) (1) that the loss of dexterity in Pulliam's right hand because of the left cerebral infarct was serious and meant he was unable to make a living as he had in the past and (2) that the occasional blackouts were more difficult to assess and did not appear to represent seizures. Dr. Sherman believed that Pulliam's current neurological disability would never improve.

More specifically, Dr. Sherman examined Pulliam's right upper extremity and noted in detail (R. 281):

The right forearm was thinner than the left. He couldn't supinate the right forearm completely. There was a loss of 50% extent of dorsiflexion to the right wrist. The elbow and shoulder were normal. Some of this may be the residue of the fracture he had at the age of 11. In undressing and dressing he used the left hand as the dominant one. He only used the right hand to hold things in a crude way. Strength at the right shoulder was good enough to overcome resistance. This was true at the elbow and wrist. Spreading the right fingers and making a cone out of the right fingers was obviously weak on the right. His grip was quite weak. He was able to pick up three coins with either hand but it was obviously slow and clumsy with the right hand. There was no doubt that he had serious dexterity problems in that hand. There was no ataxia or tremor in the upper extremities.

Examination of Pulliam's lower extremities revealed no evidence of weakness, and examination of his back revealed no evidence of spasm or restricted motion. Pulliam's gait was reasonably good except for the limited swinging of the right arm.

Dr. Sherman assessed Pulliam's functional capabilities and found (R. 283) that Pulliam could lift 5 pounds in his right hand and 20 in his left and that he could grasp with his left hand but not with his right. He believed Pulliam could sit for 6 hours out of a work day and for 2 hours at a time, and stand and walk for 3 hours in a work day and for ½ hour at a time.

*Statutory and Regulatory Framework*

All SSI claimants are put through a five-step sequential inquiry (Reg. § 1520). As *Marcus v. Sullivan*, 926 F.2d 604, 606 (7th Cir.1991) outlines it:

Step one eliminates those who are still in the workforce. 20 CFR §§ 404.1520(b), 416.920(b). Step two disqualifies claimants who do not have a "severe" impairment. §§ 404.1520(c), 416.920(c). In the third step, the impairments of the claimant are compared to a listing ("Listing") of about 120 medical conditions which the Secretary concedes are severe enough to prevent a person from engaging in any gainful activity.

§§ 404.1520(d), 416.920(d), 416.925(a). If the wage earner's impairments meet or equal a listed impairment, the wage earner is conclusively determined to be disabled. §§ 404.1520(d), 416.920(d). If the wage earner fails to establish equivalence, however, the inquiry is not over. In step four, the Secretary considers whether the impairment prevents the claimant from performing work he has performed in the past. If the claimant can, he is disqualified. §§ 404.1520(e), 416.920(e). Finally, in step five the Secretary asks whether the claimant is able to perform other work in the national economy in view of his age, education and work experience. The claimant is entitled to benefits only if he cannot per-

form other work. §§ 404.1520(f), 416.-920(f).

If the assessment of an individual reaches step five—in other words, if a claimant has a severe impairment that does not meet one of the Listings, and if he or she is not engaged in substantial gainful activity and if his or her impairment prevents the claimant from performing his or her vocationally relevant past work—then the rules in the Medical Vocational Guidelines of Reg. Subpart P, Appendix 2 (the "grid," cited "App. ¶ —") may come into play. Those grid rules reflect the analysis of the vocational factors of age, education and work experience in combination with the claimant's residual functional capacity ("RFC").

RFC is defined by Secretary as (*Marcus*, 926 F.2d at 608, quoting SSR 83–10):

> [a] medical assessment of what an individual can do in a work setting in spite of the functional limitations and environmental restrictions imposed by all of his or her medically determinable impairment(s).

Or as the district court put it in *Marcus*, RFC measures "functional ability to stand, sit, follow instructions, lift or accomplish other of the tasks which may be necessary to engage in gainful activity" (926 F.2d at 608, quoting with approval the district court opinion at 696 F.Supp. 364, 368 (N.D.Ill.1988)). RFC is expressed in terms of a claimant's maximum sustained work capability for either "sedentary," "light," "medium," "heavy" or "very heavy" work.

Where an ALJ's findings of fact as to the vocational factors and RFC coincide with all the criteria of a particular rule, the rule directs a conclusion of "disabled" or "not disabled." In addition, the grid takes into account the number of unskilled jobs in the national economy at the various functional levels, so that when the findings of fact coincide with a rule the existence of such jobs is established (App. § 200.00(b)). However, nonexertional limitations (such as pain, inability to grasp objects or bimanual dexterity) are not reflected in grid determinations. Hence App. § 200.00(e)(2) provides:

However, where an individual has an impairment or combination of impairments resulting in both strength limitations and nonexertional limitations, the rules in this subpart are considered in determining first whether a finding of disabled may be possible based on the strength limitations alone and, if not, the rule(s) reflecting the individual's maximum residual strength capabilities, age, education, and work experience provide a framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by the nonexertional limitations. Also, in these combinations of nonexertional and exertional limitations which cannot be wholly determined under the rules in this Appendix 2, full consideration must be given to all of the relevant facts in the case in accordance with the definitions and discussions of each factor in the appropriate sections of the regulations, which will provide insight into the adjudicative weight to be accorded each factor.

*Procedural History and Administrative Findings*

Pulliam filed his first application for disability benefits on May 9, 1984, alleging disability since November 27, 1982 due to stroke, right arm and hand condition, skin and stomach problems and arthritis. That application was denied both initially and upon reconsideration on the basis that his impairments were not severe. Pulliam requested and obtained a hearing, held before Administrative Law Judge ("ALJ") George Bowman on April 4, 1985. On May 10, 1985 ALJ Bowman found that Pulliam was not disabled because he retained the RFC for the full range of sedentary work and App. Table 1, Rules 201.18 and 201.19 directed a conclusion of "not disabled." On July 23, 1985 the Appeals Council denied review. Pulliam did not pursue that claim further.

Pulliam filed a second application on November 13, 1986, alleging onset of disability in 1982 due to stroke, arthritis, high

blood pressure and a plate in the head.[5] That application was initially denied on January 22, 1987. Pulliam took no further action on that claim.

Pulliam filed the current application on September 21, 1988, this time alleging onset of disability as of November 1987 due to blackouts, high blood pressure, bleeding ulcer and arthritis. This new application was denied both initially and upon reconsideration on the basis that Pulliam's impairments were not severe. Pulliam filed a request for a hearing, and ALJ John Stowell presided.

ALJ Stowell's October 18, 1989 written decision concluded that Pulliam was not disabled within the meaning of the Act. En route to that conclusion his specific findings were to this effect (R. 17): [6]

1. Pulliam had not engaged in substantial gainful activity since November 1987 [step one].

2. All the medical evidence showed that Pulliam has a severe impairment but that it does not meet any of the requirements of the Listing [steps two and three].

3. Pulliam's allegations of pain and other symptoms were credible insofar as lifting more than 20 pounds with his left hand and using his right hand can cause such symptoms.

4. Pulliam has the RFC to perform exertional and nonexertional requirements of work except for lifting and carrying more than 20 pounds with his left hand and prolonged and repeated pushing, pulling or handling with his right hand (Reg. § 416.945).

5. Pulliam is unable to perform his past relevant work as a saxophonist [step four].

6. Pulliam's RFC for the full range of light work is reduced by his loss of bi-manual dexterity.

7. Pulliam is 53 years old, defined as closely approaching advanced age (Reg. § 416.963).

8. Pulliam has a limited education (Reg. § 416.964).

9. Pulliam does not have any acquired work skills that are transferable to skilled or semiskilled work activities of other work (Reg. § 416.968) except for the job of security guard.

10. Based on an exertional capacity for light work, Pulliam's age, education and work experience, Rules 201.11 and 201.12 of Table No. 2 would direct a conclusion of "not disabled."

11. Although Pulliam's additional nonexertional limitations do not allow him to perform the full range of light work, using the above Rules as a decisional framework there are a significant number of jobs in the national economy that Pulliam could perform, such as security guard, messenger, cashier and cleaner [step five].

12. Pulliam was not under a "disability" as defined in the Act (Reg. § 416.920(f)).

13. Reopening and revision of the ALJ's 1985 decision could not be effected for lapse of time, nor could it be effected for the 1987 determination because new and material evidence had not been submitted.

On September 20, 1990 the Appeals Council denied review, so that the ALJ's October 1989 decision became Secretary's final decision. It is a judicial review of that decision that Pulliam now requests.

### Res Judicata

■ This Court is called on to treat with a threshold issue before reaching the merits of Pulliam's claim that Secretary's decision in this case is not supported by substantial evidence. It must first address Pulliam's argument that the principles of res judicata should have barred ALJ Stowell from finding an RFC of "light" because it was different from ALJ Bowman's finding of "sedentary" on Pulliam's first application for benefits.[7]

---

**5.** However, x-rays revealed no such plate.

**6.** What follows is a paraphrase rather than a direct quotation of those findings.

**7.** In response to that claim, Secretary advances the unpersuasive argument that ALJ Bowman's finding was not that Pulliam was *limited to* sedentary work but that *at the least* he could

By virtue of the non-overlapping time periods covered by the two applications at issue here, Pulliam's two claims for benefits are entirely different. His first application covered the period from November 1982 until May 1984, while the current pending application covers the period from November 1987 until September 1988. ALJ Stowell expressly stated in his findings that ALJ Bowman's decision was barred from reconsideration by passage of time. As a general principle, that decision not to reopen a prior final decision—effectively an administrative res judicata rule—is not reviewable by this Court (*Califano v. Sanders,* 430 U.S. 99, 107–09, 97 S.Ct. 980, 985–86, 51 L.Ed.2d 192 (1977)).

As is almost always the case, there is an exception—but it does not apply here. In almost all SSI cases where the issue of administrative res judicata arises, a claimant is arguing that in considering a later claim Secretary actually or constructively "reopened" the earlier-denied claim so that res judicata no longer applies to bar district court review to the extent of the reopening (*McGowen v. Harris,* 666 F.2d 60, 65–66 (4th Cir.1981); *Hennings v. Heckler,* 601 F.Supp. 919, 922–23 (N.D.Ill.1985)). For example, reopening may occur by Secretary's having reconsidered the facts of the earlier claim or having considered "new and material" evidence relating to the earlier claim (*Stoxstell v. Bowen,* No. 84 C 7317, slip op., 1986 WL 8046 (N.D.Ill. July 16, 1986), citing Reg. § 989(a)(1)). Nothing of that sort occurred here. ALJ Stowell was careful to consider only evidence of Pulliam's condition as assessed in the time period from November 1987, and the ALJ

did not use that evidence to make any findings as to the earlier claim.[8] There is no predicate for this Court to review the earlier claim either.

Here Pulliam is not contesting the application of res judicata to the earlier claim, as most typically occurs. Instead *he* wants res judicata to apply against the current claim. But as already stated, the two claims are distinct and unrelated by reason of the non-overlapping time periods of disability. Thus the prior determinations are irrelevant to the current application (*Reynolds v. Bowen,* 844 F.2d 451, 453–54 (7th Cir.1988)). ALJ Bowman's earlier findings bar reconsideration only of Pulliam's condition from November 1982 until May 1984. They do not bar consideration of his condition since November 1987.[9]

It was accordingly ALJ Stowell's duty to decide RFC independently of the earlier claim and based entirely on evidence of Pulliam's current condition. Although not crucial to the holding here, it is entirely conceivable that Pulliam's condition could have improved in the intervening 3½ years to the extent that he now has an increased capacity to function. Because ALJ Stowell did not err in ignoring ALJ Bowman's findings, this opinion now turns to the merits of ALJ Stowell's decision.

### *Substantial Evidence Standard of Review*

■ Under Section 405(g) this Court has the power to affirm, modify or reverse, with or without remand for a rehearing, Secretary's decision to grant or deny a claim for disability benefits. Section 405(g) further provides:

---

perform sedentary work. But that is neither what is entailed in a finding of a particular RFC nor what it signifies. ALJ Bowman had to make an RFC finding in order to use the grid rules, and the grid is based on the notion that the RFC is the "maximum sustained work capability" of a claimant (App. § 200.00(a)).

8. Considering evidence of a claimant's *past* condition (outside the relevant time period) is of course separate from evidence of past medical history (such as strokes or operations), which is often clearly relevant to *current* condition. Therefore, the ALJ's review of doctors' opinions that included medical history prior to Novem-

ber 1987 and within the period of time pertaining to the prior claim of disability does *not* constitute a reconsideration of that prior claim.

9. For that reason, Pulliam's citations to *Lively v. Secretary of Health and Human Services,* 820 F.2d 1391, 1392 (4th Cir.1987) and *Gavin v. Heckler,* 811 F.2d 1195, 1200 (8th Cir.1987) do not help him. Those cases simply set out the general proposition that res judicata applies to bar reconsideration of evidence relating to an earlier claim in order to lead to a finding contrary to the earlier finding. Here no contrary findings are potentially implicated.

The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive[.]

"Substantial evidence" is defined as "more than a mere scintilla ... such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" (*Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216–17, 83 L.Ed. 126 (1938)), "tak[ing] into account whatever in the record fairly detracts from its weight" (*Bauzo v. Bowen*, 803 F.2d 917, 923 (7th Cir.1986) (citations omitted)). Substantial evidence "may be something less than the weight of the evidence" (*Delgado v. Bowen*, 782 F.2d 79, 83 (7th Cir.1986) (citation omitted)), and a finding may be supported by substantial evidence even if a reviewing court might have reached a different conclusion (*id.*). What a reviewing court may not do is to "decide the facts anew, reweigh the evidence or substitute our own judgment for that of the Secretary" (*id.* at 82).

*Pulliam's RFC*

Pulliam argues that the ALJ's conclusion that he could perform "light work" is not supported by substantial evidence. Reg. § 1567(b) defines "light work":

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

In addition, SSR 83–10 states that the full range of light work requires standing off and on for approximately 6 hours of an 8–hour work day.

As already stated, Dr. Sherman—the only doctor who made specific findings as to RFC—found that Pulliam could lift 20 pounds with his left hand and 5 pounds with his right and that he could sit for 6 hours out of a work day and stand and walk for 3 hours in a work day.[10] Dr. Tabe, who found·there was no current arthritic condition of a significantly restrictive nature, reported that Pulliam was able to walk and use arms, hands, and legs in an "adequate manner." [11] Finally, Dr. Weiss assessed that there was normal motor strength in all joints except for the right hand (which was 4/5) and that Pulliam walked and bore weight well.

■ In making his findings, the ALJ chose to disregard Dr. Sherman's conclusions as to restricted walking and standing because Dr. Sherman disclaimed expertise in arthritis and his conclusion therefore appeared to be based entirely on Pulliam's complaints. Although an ALJ cannot lightly disregard a doctor's findings, he is not required to accept an opinion that is primarily based upon a claimant's subjective symptoms and is inconsistent with other evidence in the record (*Veal v. Bowen*, 833 F.2d 693, 698–99 (7th Cir.1987)). That is true here, where the ALJ was unable to find objective evidence to support Pulliam's complaints of joint pain and did not find such complaints credible. Such credibility determinations are not overturned by this Court unless "patently wrong in view of the cold record before us" (*Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir.1989) (citation omitted)), and Pulliam has pointed to nothing objective in the record to give this Court reason to pause. Indeed, it is significant in that respect that Dr. Tabe, who had found arthritic pain present in an examination prior to November 1987, did *not* find a current arthritic condition in April 1988.

**10.** Pulliam characterizes Dr. Sherman's finding as limiting Pulliam to sedentary work. However, Dr. Sherman's actual findings were "light" for the left hand and "sedentary" for the right (R. 283).

**11.** Pulliam cited as additional support for his position a March 1985 examination by Dr. Tabe in which he limited Pulliam to less than sedentary work (R. 179). However, a March 1985 assessment of functional capacity is not relevant to a claim of disability beginning in November 1987.

■ It is well within the ALJ's authority to assess medical evidence and, if it is nonuniform, to give greater weight to the evidence that he or she finds more credible (*Strunk v. Heckler*, 732 F.2d 1357, 1364 (7th Cir.1984) (citations omitted)):

[I]t is the Secretary, not the courts, who must resolve conflicts in the medical evidence.

This Court will not disturb ALJ Stowell's judgment calls. It therefore holds that there was substantial evidence to support ALJ Stowell's findings that Pulliam's only significant restriction was in the use of his right hand and that the lifting and carrying capacity of his left hand meant Pulliam met the demands of light work.

*Work in the National Economy*

■ Once a claimant demonstrates an impairment of sufficient severity as to preclude him or her from engaging in his or her past relevant work, the burden of going forward shifts to Secretary to establish the existence of alternative employment that is available in the national economy and that the claimant could perform (*Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). For Secretary to satisfy his burden at this final step of the five-step inquiry, he must find work that is "realistically" within the RFC of the particular claimant (*Jones v. Sullivan*, 1990 WL 114737, at 4, 1990 U.S.Dist. LEXIS 9164, at 9 (N.D.Ill. July 20, 1990), quoting *Lanning v. Heckler*, 777 F.2d 1316, 1318 (8th Cir.1985)).

■ Pulliam contends that the ALJ erred in concluding that there were a significant number of "light work" jobs available in the national economy that he could perform. ALJ Stowell called upon a vocational expert to aid him in making that determination, because he decided he could not simply refer to the grid rules for the final determination of disability. Although the grid can and did serve as a "framework" for decision (*Warmoth v. Bowen*, 798 F.2d 1109, 1112 (7th Cir.1986)), the loss of bimanual dexterity was a significant nonexertional limitation that meant Pulliam could not do the "full range" of light work and that required special consideration (see the

earlier quotation of App. § 200.00(e)(2)). As further elaborated in SSR 83–12:

Loss of major use of an upper extremity is rather definitive in that there is a considerable absence of functional ability....

Experience with persons who have lost the use of an upper extremity has shown that their potential occupational base is between the occupation bases for Table No. 1 (sedentary work) and Table No. 2 (light work). While individuals with this impairment have been known to perform selected occupations at nearly all exertional levels, the total number of occupations within their RFC's is less than the number represented by a full or wide range of light work.... Given an individual's particular RFC, a [vocational specialist] will be able to determine the size of the remaining occupational base, cite specific jobs within the individual's RFC, and provide a statement of the incidence of those jobs in the region of the individual's residence or in several regions of the country.

Vocational expert Meyer Klein ("Klein") testified for that very purpose. At the outset it must be conceded that Klein's testimony was often sketchy and uncertain. But once again it is not the duty of a reviewing court to decide the facts anew or to make credibility determinations—rather this Court's role is to ascertain whether there was substantial evidence for ALJ Stowell's findings, not whether this Court might or might not have decided the case differently.

Klein assessed the range of light jobs available based upon Pulliam's own testimony as to the limited use of his right hand. First Klein said that Pulliam would be able to work in any one of three jobs that required no, or only occasional, bimanual dexterity (R. 92):

1. a security guard, of which there were approximately 2,000 jobs in Chicago, half of which (or about 1,000) would not require use of a gun (R. 96);

2. a messenger on foot,[12] of which Klein made a "guesstimate," but could not say for certain, that there were 1,000 jobs in Chicago (R. 97–98); or

3. a cashier, of which there were "30,-000 to 40,000" jobs (R. 92–93).

Then the ALJ suggested that Klein take into account light use of Pulliam's right hand in the manner to which Pulliam had testified. Klein then added to the list light cleaning jobs *if* Pulliam could use his right hand enough to push a mop or a broom or pick up waste paper baskets, estimating that there were 10,000 such jobs (R. 94).[13] Finally, the ALJ posed the hypothetical situation that the limitation in Pulliam's right hand was a little more than mild, but not as great as Pulliam said. On that assumption Klein suggested that Pulliam might be able to do certain light jobs requiring bimanual dexterity (R. 99–100).

Based upon Klein's testimony, ALJ Stowell concluded that Pulliam could perform the semiskilled light job of security guard, the unskilled light job of messenger on foot, the unskilled light job of cashier and the unskilled light job of cleaner. Pulliam attacks those determinations, arguing that Secretary did not carry his burden of proving that he could *realistically* perform each of those jobs.

■ First, this Court agrees with Pulliam that substantial evidence did *not* support the ALJ's conclusion that Pulliam could realistically perform a job as a cleaner. Klein's hypothetical response was premised on a use of the right hand that had not been demonstrated. Indeed, Klein apparently based the possibility of Pulliam's ability to perform that job on Pulliam's statement that he occasionally mopped or swept his own floor (R. 99). But substantial gainful activity presupposes that a claimant can perform work on a

sustained basis at a competitive rate (SSR 83–10; *Rousey v. Heckler*, 771 F.2d 1065, 1070–71 (7th Cir.1985)). Most importantly, the ALJ expressly found that Pulliam could lift nothing in the right hand and could not engage in prolonged and repeated pushing, pulling or handling with his right hand, all of which could be safely assumed to be part of any cleaning job (see *Dictionary of Occupational Titles* ["*DOT*"] 1 (4th ed. 1977), giving a master definition of "Cleaner").[14] There is no factual basis upon which the ALJ could have concluded that Pulliam could realistically perform the job of cleaner.

■ Second, Pulliam argues that the job of cashier requires bimanual dexterity. As proof he cites to *Selected Characteristics of Occupations Defined in DOT* (1981) for a general description of a group of related "paying and receiving" occupations that states in part (*id.* Subgroup 07.03.01, at 225):

Skills and abilities required include: ... using eyes, hands, and fingers, simultaneously, to operate adding machine, calculator, or cash register[.]

It may perhaps be ambiguous whether "simultaneously" means (1) eyes simultaneously with hands or (2) both hands at the same time, but in any case the *DOT* description of the job of cashier (Occupation 211.362–010) confirms a hand- and finger-intensive job. Nevertheless, given that there is no definitive evidence that bimanual dexterity is needed, this Court cannot say that the ALJ was wrong to rely upon the expert's opinion.[15]

■ Third, Pulliam argues that it was erroneous for the ALJ to conclude that the job of messenger on foot existed in significant numbers in the economy, because Klein merely guessed as to the number of

---

12. Pulliam does not have his driver's license.

13. Klein's testimony did not itself conclude that Pulliam could indeed use his right hand in such a manner.

14. It must be remembered that the hearing at which Klein testified took place *before* Dr. Sherman examined Pulliam and found severe limitations in his right hand.

15. Pulliam cites portions of Klein's testimony for the proposition that the preponderance of cashier jobs require the use of both hands. However, Pulliam misreads Klein's testimony at that point—Klein was simply returning to the notion that the preponderance of "light jobs" in general require the use of both hands (R. 93).

those jobs. Although he knew the total number of messenger positions, Klein testified that he was not aware of any employment statistics that broke that number down into groups such as messengers on foot. In arriving at his "guesstimate," Klein stated (R. 98):

> Well, in working with people who [sic] I place and being aware of organizations that hire people, you make certain assumptions as to the kind of placements you do, so that's the kind of statistic that you have from your own knowledge and from the professional aspects of working and placing people in these fields.

Again this Court cannot say that the ALJ could not reasonably rely on Klein's expert opinion in deciding that the job existed in significant numbers in the national economy.[16]

Fourth, Pulliam disagrees as to the existence of a significant number of security guard jobs that he could perform. However, the two cases on which Pulliam relies clearly do not control here.

In *Kolman v. Sullivan,* 925 F.2d 212, 214 (7th Cir.1991) the ALJ had decided that Kolman could return to work as a "non-intervening" security guard, and it was necessary to remand the case to Secretary because it had never been determined that such a job actually existed in the economy. By contrast, Klein made specific findings as to the availability of security guard positions not requiring use of a gun, and he did *not* conclude that such jobs had to be non-intervening.

In *Ofosu v. Sullivan,* No. 88 C 7652, 1989 WL 253429 (N.D.Ill. June 27, 1989) the claimant had no use of his entire upper left extremity, and he testified that he doubted he would be able to respond quickly to emergency situations and that he had a fear of doing security work. *Ofosu* found that neither the ALJ nor the vocational expert had addressed either of those con-

cerns. Again by contrast, Klein testified that he understood the possibility of confrontation in a security guard position (R. 97), but he did not specifically find that it precluded Pulliam from performing the job. Indeed, the *DOT* description of a security guard position (Occupation 372.667–034) does not contain confrontation as a dominant feature. In any case, Pulliam presents no objective evidence to convince this Court that inability to lift or manipulate with his right hand would preclude him from generally performing the duties of security guard.

Finally, Pulliam's argument that the final hypothetical question posed by the ALJ was unrealistic is not material. ALJ Stowell did not rely upon any conclusions of Klein based upon that hypothetical.

In sum, this Court concludes that, given the use of the grid's conclusion of "not disabled" as a framework and given Klein's testimony, there was substantial evidence for the ALJ to find that Pulliam could perform the light jobs of security guard, messenger on foot and cashier, all three of which exist in significant numbers in the national economy. That spells defeat for Pulliam.

### Conclusion

There is no genuine issue of material fact in the record as to Pulliam's claim for disability under the Act. ALJ Stowell's finding of "not disabled" is supported by substantial evidence. Secretary's decision is affirmed, and this action is dismissed.

---

**16.** Pulliam also argues with Klein's conclusion that blackouts a few times a year would not interfere with the job of messenger on foot. However, ALJ Stowell did not find the blackouts to be a severe or even significant impairment, and Pulliam did not offer objective medical evidence to the contrary. Furthermore, cases cited by Pulliam such as *DeFrancesco v. Bowen,* 867 F.2d 1040 (7th Cir.1989) are distinguishable as involving more substantial disabilities that were found to affect the ability to do any light work involving the use of foot controls—thus requiring a remand to consult a vocational expert (precisely what *was* done here).