**Awilda CASSAS, Plaintiff, Appellant,**

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant, Appellee.**

**No. 89–1543.**

United States Court of Appeals, First Circuit.

Submitted Nov. 9, 1989.

Decided Jan. 11, 1990.

Opinion on Denial of Rehearing April 9, 1990.

Salvador Medina de la Cruz on brief for appellant.

Daniel F. Lopez Romo, U.S. Atty., Hato Rey, P.R., Jose Vazquez Garcia, Asst. U.S. Atty.; and Donna C. McCarthy, Asst. Regional Counsel, Dept. of Health and Human Services, Washington, D.C., on brief for appellee.

Before BOWNES, TORRUELLA and SELYA, Circuit Judges.

SELYA, Circuit Judge.

Claimant, basing disability on diabetes, high blood pressure, thrombophlebitis, arthritis, ulcers, and a vaginal condition, sought widows' insurance benefits. An

Administrative Law Judge (ALJ) concluded that as of August 4, 1987—but not before then—claimant met listing 9.08A for diabetes and, hence, was entitled to benefits. Claimant contends that she has been totally disabled since 1981 and seeks benefits for an earlier period as well. A claimant is not entitled to widows' disability benefits until age 50.[1] 42 U.S.C. § 402(e). As claimant was born in May 1936, she became 50 in May 1986. Hence, the period under consideration is the 14½ months between claimant's fiftieth birthday and August 4, 1987 (the date the claimant was determined to have met listing 9.08A).

I.

There were three main pieces of medical evidence. One was the August 1987 report of Dr. Perez Comas concluding, with reference to an August 4, 1987 electromyogram (EMG), that claimant met listing 9.08A. (Dr. Perez also testified to the same effect at the September 1987 hearing before the ALJ.) A second was the August 1986 report of Dr. Torres, an internist to whom claimant was sent by the disability determination program. While Dr. Torres gave no opinion with respect to disability, at least in lay terms, a non-examining doctor reviewing his report said claimant's condition was slight. And the third piece of evidence comprised two reports from Dr. Elsa Rodriguez, claimant's treating physician; one was dated August 1986 and the second was dated December 1986.

We start with the treating physician's reports. Although claimant told Dr. Perez that she had been seeing Dr. Rodriguez almost weekly, Dr. Rodriguez' report was very terse, illegible in places, and contained no contemporaneous clinical notes. Dr. Rodriguez indicated that claimant had initially consulted her (in 1982) for phlebitis. She had since also been treated for diabetes, hypertension, and chest pain. Claimant's condition first imposed limitations in November 1982 and reached its current level of severity in August 1983, according

1. We use the term "widows' benefits" only for convenience. Widowers and surviving divorced spouses of deceased wage earners are similarly treated by the Social Security Act and the Regulations. *See* 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. § 404.1577.

to Dr. Rodriguez. What degree of limitation was imposed at any of these times, Dr. Rodriguez did not indicate, as she did not complete a residual functional capacity (RFC) assessment or otherwise translate the medical data into lay, functional limitation terms. According to Dr. Rodriguez, claimant experienced chest pain, precipitated by exercise or stress, four to five times per day. She took nitroglycerine for it.

Claimant reported roughly similar histories to both Dr. Torres and Dr. Perez—diabetes since 1981, phlebitis in 1982, angina, urinary incontinence for at least three years, chest pain, burning, tingling sensation in the feet, aches and pains (particularly in the left shoulder and right knee) which responded to analgesics. Both doctors diagnosed diabetes mellitus type 1 (insulin dependent) and diabetic neuropathy. Dr. Perez, who had the benefit of an August 4, 1987 EMG study performed shortly before claimant's visit to him which showed "evidence of neuropathy of the posterior tibial and peroneal nerve bilaterally," relied in part on the EMG in concluding that claimant met the listing for diabetes. Dr. Torres did not specifically address the severity of claimant's condition.

Dr. Perez testified that the diabetic neuropathy confirmed by the EMG was a progressive condition which takes one to three years in its evolution. From the history claimant had recited—e.g., leg cramps, burning sensation, diminished sensitivity for the past three years, urinary incontinence—"it was being revealed that a condition was present that might not have been evaluated at its time in order to foresee that she could present a neuropathy that has been progressing," he explained. Claimant seems to draw from this statement the conclusion that she had been totally disabled long before the August 4, 1987 EMG findings. She appears to contend that her condition was the same in August 1986 (when she saw Dr. Torres) as it was in August 1987 (when Dr. Perez opined that she met listing 9.08A) and that there was no basis for the ALJ to conclude that she was disabled on the latter occasion but not on the former.

■ As lay reviewers, we may have difficulty appreciating whether or not there are significant differences in the two doctors' underlying findings. It is true that Dr. Perez indicated that major changes do not appear overnight. But, he was never specifically asked—and did not expressly address—the key question: when did claimant first satisfy listing 9.08A? If there were no major differences in the two doctors' findings, we would think claimant's attorney could have easily produced clear testimony to that effect. Dr. Perez was claimant's witness. He testified he had reviewed the record. If claimant wished to make the point that her condition from 1986 to 1987 was unchanged, her attorney could have directed Dr. Perez' attention to Dr. Torres' report, and asked him whether the clinical picture and likely degree of disability had been the same in 1986.

In any event, we do not think the Secretary was required to find that claimant's condition was the same in August 1987 as it had been a year earlier. In August 1986, Dr. Torres found discrete lower limb swelling, but no atrophy; good motion range; and normal gait, posture and balance. A year later, Dr. Perez, like Dr. Torres, saw no evidence of atrophy, but, unlike Dr. Torres, Dr. Perez appears to have found abnormalities in motion range and gait. He referred in his testimony to bilateral muscular weakness in the lower extremities "accentuated with exercise producing an intermittent crisis of claudication" (cramp like pain in legs due to insufficient blood supply). And, he wrote that his findings were "compatible with listing 9.08A: Diabetes Mellitus with neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities . . . resulting in sustained disturbance of gross and dexterous movements, or gait and station (intermittent claudication upon deambulation)". Furthermore, Dr. Perez described diminished sensitivity in the lower extremities. While, according to Dr. Perez, claimant dated the sensory loss to three years earlier, Dr. Torres had not noted any such symptomatology in his report.

In fine, it is far from clear cut that the doctors' findings were the same. The reports are certainly susceptible to the conclusion that claimant's condition had progressed in the year between the two visits and that her motor function had deteriorated in that time. Consequently, we reject appellant's contention that the Secretary was required to find that her condition was the same in August 1986 as it was a year later (and that, therefore, she was disabled on the earlier date).

## II.

Next, claimant argues that the ALJ was required to evaluate her residual functional capacity before denying benefits for the period antedating August 4, 1987. The statutory definition of disability, different for widows than for wage earners, is set forth in 42 U.S.C. § 423:

> (1) The term "disability" means—
>
>   (A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months....
>
> (2) For purposes of paragraph (1)(A)—
>
>   (B) A widow, surviving divorced wife, widower, or surviving divorced husband shall not be determined to be under a disability ... unless his or her physical or mental impairment or impairments are of a level of severity which under regulations prescribed by the Secretary is deemed to be sufficient to preclude an individual from engaging in any gainful activity.

42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(B).

Claimant relies on language in *Tolany v. Heckler*, 756 F.2d 268 (2d Cir.1985) for her claim that RFC must be considered in determining whether she can do "any gainful activity" within the meaning of § 423(d)(2)(B). In *Tolany*, the court pondered the relationship between the five step sequential evaluation procedure generally applicable to disability determinations, 20 C.F.R. § 404.1520, and the more specific procedure set forth in 20 C.F.R. §§ 404.-

1577, 404.1578 (addressed to widows' benefits). Steps 4 and 5 of the former call for an assessment of RFC in determining whether a claimant can perform her former work or other substantial gainful employment. As to widows' benefits, however, the regulations say that the Secretary will "not consider age, education and work experience" in determining disability, 20 C.F.R. § 404.1577; and that the Secretary will find entitlement to widows' benefits if the impairment meets a listing or is medically equivalent to a listing, 20 C.F.R. § 404.1578. As the Second Circuit noted in *Tolany*, the special procedure for widows' benefits does not expressly state whether RFC will be considered. 756 F.2d at 271. Furthermore, while the special procedure states when entitlement will be found— when the impairment meets a listing or is medically equivalent to a listing—it does not say that that is the exclusive method of showing that an impairment "preclude[s] an individual from engaging in any gainful activity" within the meaning of 42 U.S.C. § 423(d)(2)(B). The Second Circuit explained as follows:

> If a claimant has an impairment that is not listed and is not the medical equivalent of a listed impairment, but the claimant nevertheless is unable to engage in any gainful activity, it is difficult to see how that person may be denied benefits. It would seem anomalous if an impairment that is only presumed to be disabling because it is listed results in allowance of benefits, yet an impairment that in fact leaves the claimant without the residual functional capacity to engage in any gainful activity is insufficient to warrant benefits.

*Tolany*, 756 F.2d at 271.

To reconcile the five step sequential procedure with the special procedure for widows' benefits and to avoid the anomaly of denying benefits to a widow whose impairment is not listed but nevertheless precludes gainful activity, the Second Circuit suggested—but did not hold—that RFC might be considered in determining whether a claimant's unlisted impairment was equivalent to a listed impairment; the panel remanded for further consideration and

explanation anent the point. *Id.* at 271–72. Since then, and after the briefs were filed in this case, the Second Circuit has firmly adopted the tentative views suggested in *Tolany. See Kier v. Sullivan,* 888 F.2d 244 (2nd Cir.1989). It has concluded that the Secretary's position to the effect that RFC is not to be assessed in determining whether a widow with a non-listed impairment is disabled[2] conflicts with the directive of 42 U.S.C. §§ 402(e) and 423(d)(2)(B) that widows whose impairments preclude any gainful activity are entitled to benefits.

■ The Second Circuit's approach, though not necessarily universal, *see Willeford v. Secretary,* 824 F.2d 771 (9th Cir. 1987) (upholding denial of benefits to widow who failed to meet or equal the listings and finding "little support" for claimant's position that she should be permitted to show—without reference to the listings—inability to do gainful activity, albeit recognizing the possibility that were the absence of ability to engage in gainful activity compellingly demonstrated, the listings could become "a mechanical and unrealistic bar to a just determination") makes sense to us, and we adopt it. The informing principle underlying the listings would seem to be that, in the generality of cases, persons with a listed impairment lack the ability to work. In other words, their RFC for gainful activity is relatively nil. But, as the Second Circuit pointed out in *Kier,* the listings do not exhaust the entire universe of incapacities. Consequently, in determining medical equivalence, it seems sensible to keep in mind basic principles, focusing the inquiry on whether the impaired individual has the capacity to perform gainful activity. *See Paris v. Schweiker,* 674 F.2d 707, 710 (8th Cir.1982) (core of medical equivalence test is whether claimant is capable of gainful activity; Secretary directed to pay benefits to widow whose combined impairments precluded gainful activity); *Marcus v. Bowen,* 696 F.Supp. 364, 379–80 (N.D.Ill.1988) (adopting *Tolany* dicta).

The Secretary contends that our opinion in *Hinckley v. Secretary,* 742 F.2d 19 (1st Cir.1984), precludes acceptance of claimant's argument that RFC be considered in determining medical equivalence. We disagree. *Hinckley* was a challenge to the Secretary's regulations for determining whether a child under 18 is disabled. Similar to the regulations for widows' benefits, the regulations there at issue authorized benefits only if the child had a listed impairment or an impairment medically equivalent to a listed one. The claimants conceded that they failed to satisfy the regulatory criteria. They argued, however, that nonmedical criteria such as age, education, and functional limitations should be considered in determining disability. But, they failed to "suggest how the Secretary should weigh [the] factors." *Id.* at 23. Faced with a somewhat entropic challenge, we upheld the regulations.[3]

The challenge in the present case is narrower and more precisely targeted. It does not necessarily attack the facial validity of the regulatory requirement that a claimant must have a listed impairment or one medically equivalent thereto before being eligible for benefits, but rather, implicates the *manner* in which medical equivalence is to be determined, a matter not addressed in *Hinckley.*

### III.

We need go no further. Although we reject appellant's contention that the Secretary was required, on this record, to find that her condition was the same in August 1987 as it was 14½ months earlier, we agree with the Second Circuit that residual functional capacity cannot be ignored in considering medical equivalence and, ultimately, disability. Consequently, the judgment of the district court is vacated with directions to remand the case for further proceedings consistent with this opinion.

*Vacated and remanded.*

### ORDER OF COURT

The Secretary contends that this court applied an incorrect standard in rejecting the Secretary's approach, embodied in Social Security Ruling 83–19, that residual functional capacity not be considered in assessing medical equivalence for purposes of determining eligibility for widows' benefits. The Secretary points out that the panel opinion failed to state expressly that

---

**2.** The Secretary's position is embodied in Social Security Ruling 83–19 ("it is incorrect to consider whether the listing is equalled on the basis of an assessment of overall functional impairment"; "[t]he functional consequences of the impairments (i.e., RFC) irrespective of their nature or extent, cannot justify a determination of equivalence").

**3.** *But see Zebley v. Bowen,* 855 F.2d 67 (3rd Cir.1988) (striking down child disability regulations as too restrictive and requiring an individualized assessment of severity of functional limitations before benefits are denied), *cert. granted,* —— U.S. ——, 109 S.Ct. 2062, 104 L.Ed.2d 627 (1989).

the Secretary's position was arbitrary or capricious or not in accordance with the law, and the Secretary maintains that the panel improperly rejected the Secretary's approach merely because the panel felt another approach was somewhat more sensible.

The Secretary is mistaken. We followed the Second Circuit's opinion in *Kier v. Secretary*, 888 F.2d 244 (2d Cir.1989), in which the Second Circuit concluded that "Social Security Ruling 83–19 ... conflicts with the language of [42 U.S.C. § 423(d)(1)(A) and (d)(2)(B) ]." *Id.*, at 247. This court agrees with the Second Circuit. Contrary to the Secretary's argument, this does not mean that the Secretary must consider a widow's age, education, and work history. Rather, in determining medical equivalence, the Secretary may not ignore whether the claimant has the physical and mental capacity to do any gainful activity.

The Secretary's petition for rehearing is denied.