Avis **BENTLEY**, Plaintiff,

v.

Kenneth S. **APFEL**, Commissioner of the Social Security Administration, Defendant.

No. 3:97CV2094(GLG).

United States District Court, D. Connecticut.

July 11, 2000.

Charles A. Pirro, III, Pirro, Church & Cook, Norwalk, CT, for Plaintiff.

Deirdre Anne Martini, Ivey, Barnum & O'Mara, Greenwich, CT, for Defendant.

### DECISION ON APPEAL

GOETTEL, District Judge.

Plaintiff Avis Bentley has filed this action under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking review of a final decision of the Commissioner that denied her a retroactive period of Disabled Widow's Insurance Benefits ("DWIB") for the period February 20, 1983, to December 31, 1990. Plaintiff's counsel previously moved to have this case remanded based upon the alleged bias and prejudice of the Administrative Law Judge ("ALJ"), Samuel Kanell, against him. This motion was denied because counsel had failed to show that this particular client of his had not received a full and fair hearing as a result of the alleged bias directed against her attorney. Plaintiff has now moved for summary judgment in her favor, asking this Court to reverse the decision of the Commissioner, or in the alternative to remand this case for rehearing [**Doc. # 17**].

Defendant has moved for an order affirming the final decision of the Commissioner [**Doc. # 19**]. For the reasons set forth below, we find substantial evidence in the record to support the Commissioner's finding of no disability prior to August 22, 1985 and affirm that portion of his order. With respect to the ALJ's finding that plaintiff was not disabled between August 22, 1985, and February 20, 1990, we find that the ALJ committed a number of errors that require a remand of that portion of the order for reconsideration.

### BACKGROUND

Under Title II of the Social Security Act, 42 U.S.C. § 402(e)(1)(B), a widow, who is "disabled" and over the age of 50, is entitled to disabled widow's benefits based upon her deceased husband's earnings record if her husband was fully insured at the time of his death and her disability began not later than seven years after her husband's death.

Plaintiff claims multiple bases of disability, including a seizure disorder, a major depressive disorder, injury to three fingers on her left hand, and neck, back, and shoulder injuries caused by a series of automobile accidents. Plaintiff's medical history is discussed below in detail. Plaintiff is seeking disability insurance benefits based upon the earnings of her late husband, Keith M. Bentley, who died on February 20, 1983. At the time of his death, plaintiff had already reached the age of 50, the minimum age of eligibility for DWIB. She was not employed and had not been gainfully employed since 1959.

Plaintiff filed her first application for DWIB on March 15, 1983. This was denied. At that time, a widow was considered "disabled" for purposes of receiving DWIB only if she had an illness or impairment that prevented her from engaging in *"any gainful activity,"* 42 U.S.C. § 423(d)(2)(B)(1983), which the Social Security Administration interpreted as requiring a widow's impairment to meet, or

equal in severity, an impairment listed in Appendix 1 of 20 C.F.R., Subpart P, better known as the "Listings."[1] *See* 20 C.F.R. § 404.1577, 404.1578.

In 1991, the standard for obtaining DWIB became less stringent. Section 5103 of the Omnibus Budget Reconciliation Act of 1990 ("OBRA") (Pub.L.101–508), effective January 1, 1991, made the standard for widows' claims the same as the standard applied to other Title II disability claims, thus requiring a widow to prove only that she was unable to perform *substantial gainful activity.* 42 U.S.C. § 423(d)(1)(A);[2] *see Kier v. Sullivan,* 888 F.2d 244, 246 (2d Cir.1989).

On April 26, 1991, plaintiff filed a second application for DWIB. This was granted, and plaintiff was found to be disabled due to epilepsy and depression as of August 22, 1985.[3] However, because the new standard for determining disability did not become effective until January 1, 1991, plain-

tiff was only awarded benefits commencing on January 1, 1991, despite the ALJ's finding that the onset date for her disability was August 22, 1985. (R. 89).

Subsequently, in light of seven Circuit Court decisions that invalidated the pre–1991 process as being under-inclusive in its evaluative criteria,[4] the Social Security Administration issued Social Security Ruling (SSR) 91–3p, (56 Fed.Reg. 23,589 (1991)), which set forth a new process to be applied to DWIB claims for months prior to January 1, 1991. Although the pre–1991 statutory standard had not changed, under SSR 91–3p, the Social Security Administration stated that a widow's residual functional capacity[5] must now be considered in determining whether she was disabled. (SSR 91–3p at 2–3). The process set forth in SSR 91–3p is patterned after the five-step sequential evaluation process described in 20 C.F.R. § 404.1520.[6] If appli-

1. The Listings define impairments which would prevent an adult regardless of his or her age, education, or work experience from performing not just substantial gainful activity, but any gainful activity. *Sullivan v. Zebley,* 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). Because the Listings operate as a presumption of disability, the medical criteria for any listed impairment are at a higher level of severity than the statutory standard. *Id.* If an adult is not working and possesses an impairment which matches or equals a listed impairment, that individual is conclusively presumed to be disabled and awarded benefits without further inquiry as to whether he or she actually can perform his or her own prior work or other work. *Bowen v. Yuckert,* 482 U.S. 137, 141, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).

2. The Social Security Act defines "disability" as the

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).

3. A residual functional capacity assessment (R. 91–98) was performed in 1991, as well as a mental residual functional capacity assessment (R. 99–101). The State Adjudicator de-

termined that the residual functional capacity assessment revealed that plaintiff could perform work at the light level of exertion and noted that she has significant limitations of the left hand. He stated that she presented a poor occupational outlook due to many adverse occupational factors, including her advanced age, her lack of recent and relevant occupational experience and recommended a finding that she was disabled. (R. 113–114).

4. *See, Cassas v. Secretary of Health & Human Services,* 893 F.2d 454 (1st Cir.1990); *Kier v. Sullivan,* 888 F.2d 244 (2d Cir.1989); *Finkelstein v. Sullivan,* 924 F.2d 483 (3d Cir.1991); *Bennett v. Sullivan,* 917 F.2d 157 (4th Cir. 1990); *Marcus v. Sullivan,* 926 F.2d 604 (7th Cir.1991); *Ruff v. Sullivan,* 907 F.2d 915 (9th Cir.1990); *Davidson v. Secretary of Health & Human Services,* 912 F.2d 1246 (10th Cir. 1990).

5. "Residual functional capacity" is defined in 20 C.F.R. § 404.1545(a) as what the claimant can still do in a work setting despite the physical or mental limitations caused by his or her impairments.

6. The first step is to determine whether the claimant is engaged in substantial gainful activity. If not, the second step requires the fact finder to determine whether the claimant has a medically severe impairment or combi-

cation of this process results in a finding at step three (meets or equals a listed impairment), the widow will be found entitled to benefits for all months before January 1991 (subject to the established onset date), in which the nondisability requirements for widow's benefits are satisfied. If application of the five-step process results on a finding that the widow is able to engage in substantial gainful activity at any step in the process for all or part of the period, the widow will be denied benefits for those months of potential entitlement before January 1991, because the widow is not disabled under the pre-OBRA or OBRA standard. If application of the five-step process results in a finding at step five that the widow is unable to engage in *substantial* gainful activity (the less restrictive OBRA standard), an additional determination must be made based upon her residual functional capacity to perform a range of work comparable to the full range of sedentary work,[7] but without regard to her age, education, and work experience. (SSR 91–3p at 2–3). If the residual functional capacity assessment

shows that the widow does not retain the capacity to perform a range of work comparable to the full range of sedentary work, the widow should be found disabled and entitled to benefits for all months of potential entitlement prior to January 1991, subject to the established onset date. *Id.; see Moore v. Secretary of HHS*, No. 93–CV–72104–DT, 1994 WL 773513, at n. 1 (E.D.Mich. Dec. 1, 1994). On the other hand, if the widow retains the functional capacity to perform a range of work comparable to the full range of sedentary work or more, then the widow will be denied benefits for the period prior to January 1991, since she is functionally capable of engaging in *any* gainful activity. (SSR 91–3p at 3).

On October 26, 1992, this Court approved a class action settlement agreement in *Martel v. Sullivan*, Civil No. H–89–196(AHN) (D.Conn.), which allowed claimants whose claims had been denied under the former, more stringent standard to have their claims readjudicated based upon the standard set forth in SSR 91–3p.[8]

---

nation of impairments. Step three entails determining whether the impairment is equivalent to one of a number of listed impairments. If there is no equivalency found, the claims must demonstrate for the fourth step that the impairment prevents her from performing work she has performed in the past. At the fifth step the fact finder must determine whether the claimant has the residual functional capacity to perform other work in view of her age, education and work experience. *See* 20 C.F.R. § 404.1520. The burden of proof is on the claimant as to the first four steps. The burden shifts to the Commissioner for the fifth step. *See Rivera v. Schweiker*, 717 F.2d 719, 722 (2d Cir.1983); *Cruz v. Callahan*, No. 96 CIV. 9016(JSM), 1998 WL 142328, at *4 (S.D.N.Y. Mar. 27, 1998).

7. Social Security Ruling 91–3p provides that the Social Security Administration will use the guidelines set forth in SSR 83–12, 83–14, and 85–15 for determining whether a widow has the residual functional capacity to perform a full range of sedentary work, based upon exertional impairments, nonexertional impairments, and a combination of the two. (SSR 91–3p at 3). According to the regulations, sedentary work involves lifting no more than 10 pounds at a time and occasionally

lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a).

8. The Social Security Administration summarized the difference in the two standards, pre- and post-dating January 1, 1991, in a Social Security Notice to plaintiff dated July 7, 1994, as follows:

The Martel court order requires the Social Security Administration to look at your case again to determine whether we had denied your claim without considering how your functional limitations affect your ability to do gainful activity.

There are two different rules for disabled widow/ers' benefits. Under the first rule, Social Security Ruling 91–3p, functional limitations related to your health problems must keep you from doing any gainful work. You must meet this rule to get disabled widow/ers' benefits before January, 1991.

Plaintiff was given notice that she could seek reconsideration of her application based on *Martel*, (R. 115), and accordingly, she requested reconsideration of the denial of her application for prior entitlement to DWIB beginning February 20, 1983. New physical and psychiatric review forms were obtained by the Social Security Administration. *See* Discussion at 376–77, *infra*. The Social Security Administration determined that there was no evidence that her health problems had become disabling prior to August 22, 1985, nor that her functional limitations related to these problems would have kept her from doing *any* gainful work between August 1985 and December 1990. Therefore, they found that the previous decision that plaintiff's benefits would begin as of January 1991 was correct. (R. 148). Plaintiff's counsel then requested a hearing before an ALJ. (R. 150). After a hearing at which plaintiff testified (*see* Discussion at 11–13, *infra*), the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act. He first held that plaintiff did not have an impairment or combination of impairments that met the criteria of any impairment in the Listings.[9] He further found that her complaints of disabling pain were not credible in light of the medical records and her daily activities. He also found that, prior to February 20, 1990,[10] plaintiff retained the residual functional capacity to perform work at the sedentary to light level of exertion and, thus, retained the ability to perform gainful activity during that period. Therefore, the ALJ held that plaintiff was not disabled. (R. 22–32). Plaintiff submitted additional arguments to the Appeals Council (R. 7–13), which denied her request for review on August 11, 1997 (R. 5–6), thus rendering the ALJ's decision a final decision of the Commissioner subject to review in this Court.

## DISCUSSION

In reviewing the Commissioner's decision, the Court must first determine whether the correct legal standard was applied and then whether the record contains substantial evidence to support the decision of the Commissioner that plaintiff was not entitled to DWIB prior to January 1, 1991. 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...."); *see Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). "Substantial evidence" is "evidence that a reasonable mind would accept as adequate to support a conclusion;" it is more than a "mere scintilla." *Id.; Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir.1996). The Court,

---

Under the second rule, Public Law 101–508, functional limitations related to your health problems must keep you from doing your past work and, considering your age, education and work experience, any other substantial gainful work. You must meet this rule to get disabled widow/ers' benefits January 1991 and later. (R. 152).

9. The ALJ also completed the Psychiatric Review Technique Form for the period August 22, 1985 to January 1, 1991, for disorders under Listing 12.04 (Affective Disorders) and Listing 12.09 (Substance Addiction Disorders). He rated the degree of functional limitation caused by these disorders as "slight" for restrictions on daily living; "slight" for difficulties in maintaining social functioning; "seldom" for deficiencies of concentration and failure to complete tasks in a timely manner; and one or two episodes of deterioration or decompensation in work-like settings. (R. 33–36).

10. The various dates in this case become somewhat confusing and, indeed, the ALJ at times referred to the incorrect dates. To be entitled to DWIB, plaintiff must demonstrate that her disability commenced within seven years of her husband's death. If her disability commenced during that seven-year period, then she would be entitled to DWIB for every month thereafter. Thus, in this case, plaintiff had to establish that she became disabled prior to February 20, 1990, which is seven years from the date of her husband's death. However, the period for which plaintiff is seeking retroactive benefits is from the date of her husband's death until December 31, 1990. Plaintiff has already been awarded benefits commencing January 1, 1991.

however, may not reweigh the evidence or substitute its own discretion for that of the Commissioner. *Brown v. Bowen,* 801 F.2d 361, 362 (10th Cir.1986). Thus, the Court must give conclusive effect to the Commissioner's determination that the plaintiff is not entitled to DWIB prior to January 1, 1991, if we find that the decision was supported by substantial evidence. *See Cruz v. Callahan,* No. 96 Civ. 9016(JSM), 1998 WL 142328, at *3 (S.D.N.Y. Mar. 27, 1998).

Plaintiff maintains that since 1981, when she was involved in an automobile accident and sustained a head injury, she has been disabled as that term is defined by the *Martel* decision and SSR 91–3p and, therefore, is entitled to retroactive DWIB for the period February 20, 1983, to December 31, 1990. Alternatively, plaintiff maintains that, based upon the opinions of her treating physicians, she meets the requirements of one or more of the Listings. Finally, plaintiff asserts that, if the Court does not reverse the Commissioner's decision, there is, at a minimum, good cause to remand based upon a number of errors committed by the ALJ. Defendant, of course, argues that the Commissioner's findings are supported by substantial evidence and should be affirmed.

### A. Plaintiff's Testimony Before the ALJ

At the hearing before the ALJ on July 17, 1995, plaintiff described her medical problem as "amnesia," blacking out when she forgets to take her Dilantin, which she is required to take on a daily basis. She testified that the last time this happened was a couple of years ago. (R. 66, 76, 79). She stated that she does not have blacks outs when she takes her medication. (R. 66). When she has a seizure, she testified that, according to her doctors, she does not remember it and, therefore, she cannot remember how frequently she had seizures during the period 1983 to 1991. (R. 76, 80). Plaintiff testified that she had been treating with Dr. Hampton, her psychiatrist, on a monthly basis for her seizures

and the emotional problems that she has experienced since the death of her husband, and that Dr. Hampton monitors her Dilantin. (R. 68, 76). At the time of the hearing in 1995, plaintiff indicated that she was still suffering from depression but that it was not as bad as it had been between 1984 and 1991. (R. 78). When she experienced periods of depression, she stated that she could not do anything. (R. 76). She testified that her stamina was not what it had been before 1983. She complained that she had trouble moving the fingers on her left hand, which she injured in 1987, but indicated that it had improved with the reconstructive surgery and physical therapy. (R. 67–68). She stated that she still had difficulty gripping and lifting with this hand. (R. 73–74). Her back, which she injured in an automobile accident in 1984, still hurt, particularly in damp weather. (R. 78). Plaintiff testified that, as of the date of the hearing, she was taking Dilantin for her seizures, Xanax for her depression, Advil for headaches, and Dalmane to help her sleep. (R. 68, 70, 73).

Plaintiff also completed a pain questionnaire in 1994 that essentially reconfirmed her testimony in this regard. She stated that she has been experiencing intermittent back, left shoulder, and left hand pain, as well as numerous headaches, since 1982–83. Plaintiff stated that she experienced pain in one or more places at least once a day. (R. 175–76).

In terms of her activities, plaintiff testified that her mother, who was 88 at the time of the hearing, had been living with her since her husband's death, to help her with the three children. In 1995, one of her three sons, age 32, also lived with her. (R. 63). She testified that she does everything at a slow pace and is not too active. (R. 64). She has not worked since 1959 and has not been gainfully employed since her husband's death. Plaintiff testified that she only drove an automobile when necessary, and then not for long distances. She stated that she does a minimal amount of housework and cooking. (R. 66–67).

She does light cleaning and her son does the rest, including vacuuming. (R. 75). She does some shopping, but that is mostly done by her son or a friend. *See* Activities Questionnaire dated 1/25/94 (R. 177–180). Plaintiff stated that she can care for her personal needs and grooming. *Id.*

### B. Plaintiff's Medical Records

After a complete review of the record in this case, the Court has divided plaintiff's medical records into two parts: first, her medical records prior to August 22, 1985, the date on which plaintiff's seizures began and the date on which the Social Security Administration found her to be disabled under the more lenient OBRA standard; and, second, her records from August 22, 1985, to February 20, 1990, the last onset date which would allow plaintiff to be eligible for DWIB.

### 1. Plaintiff's Medical Impairments Prior to August 22, 1985

The first medical records of any significance date back to January 1977, when the plaintiff was hospitalized for a drug and alcohol overdose. The hospital records note no prior history of depression. (Exh. 36). Later medical records refer to this as a suicide attempt with Meprobamate and alcohol. (*E.g.*, R. 284).

In 1981, plaintiff was hospitalized for severe anxiety due to family problems. Her husband was unemployed, her sons had been involved in four automobile accidents in one month, and she was having problems with her sons. (Exh. 37). Dr. Carl Jaeger was her treating doctor.

On December 18, 1981, plaintiff was involved in an automobile accident, in which she was thrown from the back seat and hit her head on the dashboard, suffering a severe whiplash. There was no skull fracture. She was briefly unconscious and was seen at a local hospital. Thereafter, she was treated by Dr. Jaeger, who diagnosed "cervical strain" and prescribed muscle relaxants. His notes also reflect that plaintiff was "most unstable" due to family problems. (Exh. 39). Plaintiff received physical therapy three times a week for her neck, back and shoulder problems. (Exh. 52). However, when they did not resolve, in October 1982, she began seeing Dr. Thomas Rodda, a neurologist. His impression was "a severe flexion-extension injury to her neck associated with possible compression fractures of T5 and T9." He treated her conservatively with physical therapy and bedrest. (Exh. 39). Plaintiff was also treated by Dr. Walter Camp, another neurologist, for these problems. His records indicate that plaintiff had been having intermittent neck pain and severe headaches at times, but her neurological examination was normal in all respects. She had only slight limitation of neck movement and neck tilting. A cranial CT was performed on November 8, 1982, which was normal. (R. 221).

Plaintiff continued to experience neck and shoulder pain, and when she failed to improve at home, she was hospitalized at Greenwich Hospital by Dr. Rodda in January, 1983 for eleven days for bed rest and traction. (Exh. 17, 39). On physical examination, Dr. Rodda noted that she had limitation of motion of her neck and left shoulder and paravertebral spasm. (R. 182). Upon plaintiff's discharge, Dr. Rodda reported that she showed improvement and now had a good range of motion in her neck. (Exh. 17). Plaintiff was instructed to rest at home, avoid all stress, and return to see Dr. Rodda in two weeks. *Id.*

In May of 1984, plaintiff was involved in another automobile accident. She was seen at a local hospital, where x-rays of her right wrist, left leg, and skull and nasal bones were taken. The only positive finding was a fracture of the nasal bones. (R. 266). She was then seen by Dr. Rodda and subsequently admitted to Greenwich Hospital with complaints of increasing neck pain. (Exh. 41). Plaintiff was hospitalized for three days for cervical traction and had a closed reduction of the nasal fracture performed by Dr. Joe Douglas

Watts. (R. 267, 271). Her history of depression was noted in the hospital records. (Exh. 41).

In 1983, Dr. Jaeger saw plaintiff on a number of occasions during which he noted an addiction to Equanil.[11] In 1985, this was again noted and plaintiff was to go to Silver Hill Hospital (a drug treatment facility) in September for her drug addiction. However, on August 27, 1985, when Dr. Jaeger saw plaintiff he noted not only "drug addiction" but also "seizure disorder."

In June, 1984, plaintiff was also seen by Dr. Richard Eaton, a hand surgeon, who diagnosed mild degenerative osteoarthritis in plaintiff's right hand and a partial tear of a ligament of the middle finger. (Exh. 42).

## 2. Plaintiff's Medical Impairments After August 22, 1985

On August 21, 1985, following an altercation with her boyfriend, plaintiff was treated at the Greenwich Hospital emergency room for chest pain. She was sent home but returned to the hospital the next morning with the same complaints. Dr. William Hampton, a psychiatrist, examined plaintiff and admitted her to the hospital with a diagnosis of depressive disorder. Dr. Alleva was called to clear the patient medically and during his examination of her, she experienced a grand mal epileptic seizure. (Exh. 43). She was also diagnosed with alcoholic liver disease. Plaintiff was treated with Dilantin and sedatives and released after four days in the hospital. Thereafter, plaintiff continued to treat with Dr. Hampton through at least 1994 for her seizure and depressive disorders. (Exh. 43–45, 34).

In October of 1985, plaintiff was brought to the hospital by the police and was again admitted with another seizure. She was confused and amnesic and was reported by family members to have set several fires in her home prior to being brought to the hospital. (Exh. 44). Dr. Hampton diagnosed complex partial seizure, amnesic disorder, and hepatic inflammation secondary to alcohol. Dr. Camp, who performed a neurological consultation, concurred in this assessment.

Plaintiff was again admitted to Greenwich Hospital in May of 1986 in an acute, depressed state as a result of a loss of awareness due to her failing to take her medication. She was diagnosed with temporal lobe epilepsy of mixed type with depressive reaction. (Exh. 45).

In December 1987, plaintiff slammed her left hand in a door, fracturing her third, fourth, and fifth fingers, which injury was subsequently complicated by infection. At the time of the incident, plaintiff came to the emergency room in an extremely intoxicated state. (Exh. 46). She subsequently underwent extensive physical therapy but eventually required amputation of a portion of these fingers and skin-grafting. (Exh. 46, 53). Even after physical therapy, she had limited range of motion, flexion, and contraction of these fingers. Dr. Richard Eaton saw the plaintiff on referral in March of 1989 and reported that the range of motion of the left fourth and fifth fingers was only 70 degrees of flexion. The fingers were semi-locked, which Dr. Eaton noted might require surgical intervention. (R. 207).

In 1988, plaintiff was involved in another automobile accident associated with her excessive intake of alcohol. Plaintiff had no recollection of the accident in which she had driven into a tree. She sustained multiple contusions and a non-displaced nasal fracture. (Exh. 50).

In May of 1991, Dr. Hampton wrote the Bureau of Disability Determination, stating that plaintiff had been under his care and treatment for many years for "a severe depressive illness complicated by temporal lobe epilepsy." (Exh. 27). He described plaintiff as having poor judgment; oriented to time, place and person;

---

**11.** Equanil is a manufacturer's brand name    for meprobamate.

memory in tact; depressed mood with a serious suicide attempt some years ago requiring hospitalization. In addition, he stated that she showed anxiety and had a tense rather explosive personality. Her thought content was of poor quality. He reported that plaintiff could take care of herself and attend to her daily needs most of the time; however, because of her depressive illness and temporal lobe epilepsy, she has periods which she cannot function. In addition, she has periods when she has behaved inappropriately, including fire-setting, petty theft, alcoholism, and disagreements with family members, indicating an inability to function in a work setting. He described her as having difficulties in concentration. She has been taking anticonvulsive medication since 1986 with good results during the periods which she has taken the medication, but there have been times when she has quit taking the medication and her symptoms have recurred. Her course of illness shows characteristics of depression, anxiety, suspicion, fearfulness, and withdrawal. It was his considered opinion that the patient was unemployable. At the time, plaintiff was taking Dilantin, 100 mg. four times a day, Valium, 5 mg. twice a day, and Halcion, .25 mg. at bedtime. His diagnosis was "partial complex seizures, temporal lobe type with automatic behavior; depressive disorder." *Id.*

According to a Disability Report completed in May, 1991, by Dr. Jaeger, plaintiff's primary treating physician, plaintiff suffered from Grand Mal epileptic seizures, which he had himself observed and for which she was hospitalized. Plaintiff has been on Dilantin since 1985 for these seizures. (R. 209–210).

Upon plaintiff's application for reconsideration after *Martel*, Dr. Hampton again wrote the Bureau of Disability Determination on March 7, 1994, reiterating his opinion that, as of August 1985, plaintiff was "disabled, and since that time has remained so." (Exh. 34). Although he noted that plaintiff was able to walk, drive a car, manage simple household tasks, and relate to friends and relatives, he was of the opinion that plaintiff was not employable in any ordinary job. He described her stress reaction as extreme, stating that she could not tolerate any pressure. Her symptoms, both epileptic and emotional, were increased when she was under any anxiety. He stated that the "patient's course of illness has shown a characteristic of recurrent periods of epileptic seizures, aberrant behavior, depression, and anxiety, particularly when the patient has stopped medication, but also when the patient has been taking her medication properly." *Id.* He described the frequency as several times a month with exacerbations or even more frequently than that. The duration of the exacerbations are usually a week or two. *Id.*

On July 25, 1995, Dr. Jaeger, plaintiff's treating internist, provided plaintiff's attorney with an opinion letter stating that plaintiff had seizures that occurred at roughly monthly intervals and that she has a depressive disorder. He was of the opinion that "she satisfies all of the criteria for being a full-blown bipolar manic depressive . . . ." (R. 38–39).

On July 31, 1995, Dr. Hampton provided plaintiff's attorney with an opinion letter stating that the severity of plaintiff's depressive disorder, identified by sleep disturbance, psychomotor agitations, decreased energy, feelings of guilt and worthlessness, and difficulty with concentration and thinking, met the Listing criteria for Affective Disorders, Section 12.04. (R. 40). He further stated that her Major Motor seizures do *not* occur "more frequently than once per month despite prescribed medication." *Id.* He indicated that seizures do occur when she does not take her medication, which she fails to take because of her depression, not because she wishes to have seizures. *Id.* He stated that her affective disorder is characterized by a disturbance of mood with marked restriction in activities of daily living and deficiencies of concentration, persistence

and pace resulting in frequent failure to complete tasks in a timely way.[12] *Id.*

### C. Social Security Assessments

On May 30, 1991, in connection with her 1991 application for DWIB, plaintiff was evaluated by Examiner Dr. Henry Markley on May 30, 1991. (Exh. 30). He was of the opinion that she was mainly limited by her depression, which caused her to be weak, tired, and prevented her from doing her usual daily activities. He noted that she has been treated by a psychiatrist for the past four years without much improvement. He also noted some disability in her left hand related to the old injury and mild residual deformity. He saw no objective evidence of epilepsy, but noted that she was taking her medication. He concluded that it seemed unlikely that she would ever return to gainful employment. (R. 217).

Dr. Leonard Gold also examined plaintiff on May 29, 1991. He was of the opinion that, at that time, she was not able to perform work-related tasks. She could understand but would forget the requirements of the tasks. Additionally, she would become more anxious and then unable to concentrate, which led to confusion and inadequate communications. Personal adjustments were inadequate. Her contact with reality was tenuous and she was markedly restricted in her daily activities. He felt that improvement was unlikely and diagnosed "posttraumatic brain syndrome, epilepsy, cognitive limitations; unresolved adjustment reaction, now in a chronic, generalized anxiety state." (R. 219)

In 1991, as part of the State Agency's initial review of plaintiff's claim, consultant Dr. Hester Reik completed a residual physical functional capacity assessment of plaintiff. Plaintiff's primary diagnosis was listed as affective disorders with a secondary diagnosis of epilepsy. (Exh. 2). Dr. Reik noted a mild deformity of the fourth and fifth fingers of plaintiff's left hand. In terms of plaintiff's residual functional capacity, he found that plaintiff could lift 20 pounds occasionally, 10 pounds frequently and could stand and/or walk or sit with normal breaks for about 6 hours in an 8-hour workday. Her ability to push/pull was limited by the injury to her left hand. He found no postural limitations. Plaintiff's ability to manipulate her left hand was limited in terms of gross manipulation, fine manipulation, and feeling, and a weak grip. She had no manipulative limitations in her right hand. He indicated that she must avoid all exposure to hazards, such as machinery and heights because of her grand mal seizures. (Exh. 2).

A mental residual functional capacity assessment was also performed by Dr. Patrick Griel, who found plaintiff to be moderately limited in her ability to understand and carry out detailed instructions, in her ability to maintain attention and concentration for extended periods and to perform activities within a schedule. (R. 99–112). Plaintiff was also found to be moderately limited in her ability to complete a normal workday and workweek without substantial interruptions due to psychologically based symptoms and was limited in her ability to perform at a consistent pace without an unreasonable number and length of rest periods. She also had difficulty in setting realistic goals and making plans independent of others. (R. 99–100). Dr. Griel further evaluated her impairments to determine whether her affective disorder met the requirements of Listing 12.04. He indicated that she suffered from a "disturbance of mood, accompanied by a full or partial manic or depressive syn-

---

**12.** Plaintiff argues that the ALJ and the Appeals Council failed to consider these 1995 reports of Dr. Jaeger and Dr. Hampton. The basis for this assertion is that these specific reports are not mentioned in the ALJ's Decision and were not included in the list of exhibits. They are, however, part of the record. Merely because they were not referenced by the ALJ does not necessarily mean that they were not considered. We decline to second guess the ALJ's reasons for not referencing these reports and decline to find any error in this regard.

drome, as evidenced by dysthemia." (R. 106). In terms of rating the severity of her impairment, he rated her restrictions of activities of daily living as "slight;" difficulties in maintaining social functioning "slight;" deficiencies of concentration, persistence or pace, resulting in a failure to complete tasks in a timely manner "often;" episodes of deterioration or decompensation in work or a work-like setting "never," and thus found that her functional limitations did not satisfy the requirements of Listing 12.04 (R. 110).

A vocational analysis performed on July 9, 1991, indicated that plaintiff had the residual functional capacity to perform work at the *light* level of exertion. Plaintiff was noted to have significant limitations of the left hand. She presented a poor vocational outlook due to her advanced age and lack of relevant occupational experience. (R. 113–14).

In 1994, plaintiff's claim was reviewed again by Dr. Marie Municciolo, pursuant to *Martel* for a possible earlier onset date for her disability. (R. 117). Dr. Municciolo considered plaintiff's impairments in three stages. She determined that plaintiff's acute neck strain with possible compression fractures of T5 and T9 from the December 18, 1981 automobile accident did not result in any significant impairment. She noted that by May of 1991, plaintiff's neck and neurological examination was within normal limits. Dr. Municciolo then looked at the period between August 22, 1985, when plaintiff's temporal lobe epilepsy began and December 10, 1987, when plaintiff injured her hand. She noted that plaintiff experienced one to two episodes per year of inappropriate behavior (petty theft, alcoholism, fire-setting) which occurred when plaintiff did not take her Dilantin. She noted that she was able to drive but has had several motor vehicle accidents and should be limited as to hazards beginning in August 22, 1985. She

found no exertional, postural, manipulative, communicative or visual limitations as a result of the epilepsy, but did state that plaintiff should avoid all exposure to hazards (machinery, heights, etc.). She then considered plaintiff's degree of impairment after December 1987, taking into account her seizures plus her hand injury and determined that plaintiff would be limited to the *light* level of exertion. (R. 129). Thus, based upon Dr. Municciolo's evaluation, plaintiff's residual functional capacity exceeded the requirements for sedentary work, and thus did not meet the pre-OBRA standard for DWIB.

### D. The Commissioner's Decision

#### 1. The Correct Legal Standard for DWIB Eligibility Under Martel

As noted above, plaintiff was found disabled by the Social Security Administration under the more lenient OBRA standard with a disability onset date of August 22, 1985. However, under the more stringent pre–1991 standard, the Commissioner found that plaintiff was not disabled. The ALJ followed the five-step sequential evaluation process and found that plaintiff's impairments did not meet or equal any of the Listings, specifically Listing 1.05C for vertebrogenic disorders; Listing 1.05B for compression fractures due to osteoporosis; Listing 11.02 for epilepsy; Listing 1.13 for soft tissue injuries of an upper extremity; and Listings 12.04 and 12.09 for affective disorders and substance addiction disorders.

Although we do not read the ALJ's Decision as requiring plaintiff to prove that her impairment met the requirements of the Listings, defendant now argues that plaintiff was required to show that her condition met or equaled a listed impairment prior to January 1, 1991.[13] That is incorrect. *Kier*, 888 F.2d at 246. This Court has expressly rejected as underin-

---

13. Defendant states in its brief, "Prevarications aside, plaintiff was required to show that her condition met or equaled a listed

impairment prior to January 1, 1991. She has failed to do so." (Def.'s Brief at 11).

clusive the pre-SSR 91–3p standard that looked only at whether plaintiff's condition met or equaled the Listings. As discussed above, under SSR 91–3p and *Martel*, the five-step sequential process of the Regulations is still followed, *see* 20 C.F.R. § 404.1520, but after step five, an additional step is added, requiring plaintiff to demonstrate that she does not retain the residual functional capacity to perform the full range of sedentary work, regardless of whether her impairment meets or equals the level of severity of a listed impairment. Obviously, if plaintiff can demonstrate that her impairment met or equaled one of the Listings, she has met her burden. However, if her impairment does not rise to the level of severity of a listed impairment, she may still prove entitlement to DWIB based upon her lack of residual functional capacity to perform sedentary work.

## 2. The Finding of "No Disability" Prior to August 22, 1985

■ Although plaintiff was suffering from depression and periodic drug and alcohol addiction, and had been involved in two automobile accidents in which she suffered cervical sprain, neck and shoulder problems, we find that the Commissioner's determination that plaintiff was not "disabled" prior to August 22, 1985, is supported by substantial evidence in the record. Although there were short-term limitations on plaintiff's ability to work, no physician placed any limitations on plaintiff's ability to perform work-related activities for a period of twelve months or more. The hospital records from 1983, following plaintiff's first automobile accident indicate that she showed improvement and left the hospital with a good range of motion in her neck. (Exh. 17). In 1984, after the second accident, plaintiff was to see Dr. Rodda on an outpatient

basis and to have physical therapy. (Exh. 41). There is nothing in the record, however, that indicates that plaintiff was unable to perform at the sedentary level of activity following this accident. As for plaintiff's depression, although plaintiff required hospitalization on several occasions prior to 1985, there are no records indicating that plaintiff was under the care of a psychiatrist during this period nor are there any records of limitations on her activities caused by her depression.

Plaintiff argues that, during this period, her back, neck and shoulder impairments met Listing 1.05C, applicable to vertobrogenic disorders, such as a herniated nucleus pulposus or spinal stenosis.[14] To demonstrate disability under section 1.05C, plaintiff must show that she suffered from (1) pain, muscle spasm, and significant limitation of motion in the spine; and (2) appropriate radicular[15] distribution of significant motor loss with muscle weakness and sensory and reflex loss. These symptoms must persist for at least three months despite prescribed therapy and be expected to last twelve months. 20 C.F.R., Pt. 404, Subpt. P, App. 1. Listing § 1.05C. The general instructions applicable to all musculoskeletal disorders set forth in Section 1.00 of the Listings elaborate on the specific requirements of section 1.05C and state that "appropriate abnormal physical findings must persist on repeated examinations despite therapy for a reasonable presumption to be made that severe impairment will last for a continuous period of 12 months." There must also be a detailed description of the orthopedic and neurologic examination findings including a description of gait, limitation of movements of the spine given quantitatively in degrees from the vertical position, motor and sensory abnormalities, muscle spasm and deep tendon reflexes. *Id.* Ob-

**14.** "Vertebrogenic disorder" largely refers to a category or class of disorders relating to the vertebra or the spinal cord. "Nucleus pulposus" is the central portion of an intervertebral disk. *Dorland's Medical Dictionary* at 1064 (25th ed.1974). "Spinal stenosis" results

from lumbar spinal canal narrowing, causing pressure on the sciatic nerve roots. *The Merck's Manual* at 476 (17th ed.1999).

**15.** "Radicular" pertains to a disease of the nerve roots. *Id.*

servations of the patient during the examination should be reported with respect to any significant motor loss. *Id.* Moreover, the continuous presence of abnormal findings over a period of time must be established by a record of ongoing treatment. *Id.* The medical records are devoid of these required findings.

Plaintiff argues that the ALJ incorrectly concluded that plaintiff never had muscle weakness. Although the records do contain sporadic reference to neck and back muscle spasms, plaintiff must still meet the second prong of section 1.05C that this condition persisted for a period of at least three months. Moreover, plaintiff must establish that she had significant motor loss and sensory and reflex loss for a period of at least three months. There is nothing in the record to support a finding in this regard. Additionally, no physician treating plaintiff for any of these spinal problems assessed her ability or inability to work because of these conditions or placed any limitations on activities that she was performing because of these spinal conditions. Therefore, we find substantial evidence to support the ALJ's determination that plaintiff's back and neck problems did not meet the requirements of Listing 1.05C.

### 3. The Finding of "No Disability" after August 22, 1985

██ In reviewing the Commissioner's Decision, we find that numerous errors were committed by the ALJ in his review of the medical record for the period August 22, 1985, to February 20, 1990.[16] In light of these errors, we find good cause for remanding this portion of the Commissioner's decision for reconsideration.

First, the ALJ erroneously assumed that Dr. Hampton was an internist, when in fact he was plaintiff's primary treating psychiatrist, affiliated with the Greenwich Hospital, who treated plaintiff for her psychiatric disorders for a period of nearly ten years.

Second, the ALJ assumed incorrectly that plaintiff had not received ongoing psychiatric treatment, and that no treating physician had suggested such treatment during the relevant periods. To the contrary, plaintiff was treated continuously by Dr. Hampton for ten years. His records and her testimony confirmed this. Moreover, the medical records are replete with references to the numerous medications plaintiff was taking throughout the relevant time period to treat her depression and to control her epileptic seizures. (*E.g.*, R. 197, 213, 229).

Third, the ALJ failed to accord Dr. Hampton's medical opinions the deference that is required of the opinions of treating physicians under the "treating physician rule."[17] The regulations require a statement of reasons for not crediting the opin-

---

16. As plaintiff points out in her Memorandum, there are numerous incorrect dates in the ALJ's decision. Some relate to the commencement of the disability period for which plaintiff is seeking DWIB; others appear to be clerical errors. It does not appear that these errors affected the ALJ's determination, however, since he considered plaintiff's entire medical history dating back to the earliest date for which he presumed plaintiff was seeking DWIB. As discussed *supra*, the dates for which plaintiff is seeking retroactive DWIB are February 20, 1983, to December 31, 1990.

17. The treating physician rule provides that the ALJ must give "controlling weight" to a "treating source's opinion on the issue(s) of the nature and severity of [the claimant's]

impairment(s)" if that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2); *see Rosa v. Callahan*, 168 F.3d 72 (2d Cir.1999) (holding that the opinion of a treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence). Factors that will be considered in determining the amount of weight to be given the opinion of a treating physician are: the length of the treatment relationship and the frequency of examination, 20 C.F.R. § 404.1527(d)(2)(i); and the nature and extent of the treatment relationship, 20 C.F.R. § 404.1527(d)(2)(ii). In analyzing a treating physician's report, the

ion of a treating physician. 20 C.F.R. § 404.1527(d)(2). Although the ALJ gave lip service to the physician rule, he improperly discounted Dr. Hampton's opinion that plaintiff was disabled because it was "retrospective" and rendered after the period of disability for which retroactive benefits were being considered. To accept this view would be to discount all opinions of treating physicians other than their contemporaneous treatment notes. It is common practice for a treating physician to render an opinion on a patient's disability based on the cumulative years of treatment. His or her opinion is not to be disregarded simply because it is retrospective or cumulative in the sense of looking back over numerous years of treatment. *See Wagner v. Secretary of Health & Human Services*, 906 F.2d 856, 861–62 (2d Cir.1990). While we agree with the ALJ that Dr. Hampton's opinion concerning the probable date for plaintiff's onset of disability *prior to the date he began treating her* is speculative and not entitled to the weight normally afforded an opinion of a treating physician, his opinions concerning her disability during the time he treated her were not afforded the proper weight required by the Regulations.

Likewise, the ALJ did not afford the opinion of Dr. Jaeger, plaintiff's primary care doctor, the controlling weight that is required by the treating physician rule. There is nothing so "overwhelmingly compelling" in the ALJ's opinion to permit the him to "overcome" an otherwise valid medical opinion of a treating doctor, nor did the ALJ provide "good reasons" for rejecting this opinion. 20 C.F.R. § 404.1527; *Rosa v. Callahan*, 168 F.3d 72, 78–79 (2d Cir.1999). No physician has expressed an opinion contrary to that of Dr. Hampton and Dr. Jaeger, plaintiff's two treating physicians, that she was disabled. Instead, in this case, the ALJ substituted his opinion for that of two specialists, who

treated plaintiff for a significant period of time, without applying the specific factors required by the Regulations when the opinion of a treating physician is rejected. The ALJ erred as a matter of law in rejecting these uncontradicted findings of plaintiff's psychiatrist and her primary care doctor without proper explanation. 20 C.F.R. § 404.1520a; *see Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir.1998); *Rodriguez v. Chater*, 962 F.Supp. 298, 300 (D.Conn.1997).

Fourth, both the ALJ and the Government overlooked the numerous diagnoses of epilepsy contained in the record. These were not "retrospective." Rather, the initial diagnosis of epilepsy was made at the time of plaintiff's first hospitalization for seizures and was repeated throughout the course of her medical treatment. *See, e.g.*, R. 283 (Discharge Summary of Dr. Hampton for hospitalization of 8/22–26/85, stating that plaintiff had a "grand mal epileptic seizure"); R. 227 (Letter of March 7, 1994 from Dr. Hampton to Bureau of Disability Determination, stating that on August 22, 1985, plaintiff suffered from a complex seizure disorder with temporal lobe epilepsy and referring to her recurrent period of epileptic seizures and noting that she was taking an anti-epileptic drug).

Fifth, the ALJ described plaintiff's mental disorder as "transient" when no physician described it as being transient in nature. To the contrary, Dr. Hampton, her treating psychiatrist stated that her condition was "chronic," (Exh. 18), "persistent," (R. 227), and that she had been disabled since her husband's death. *Id.* An EEG performed in 1991 confirmed abnormalities consistent with paroxysmal disorder of bitemporal origin and drug effect, which would seem to confirm the chronic nature of her mental disorder. (R. 214). Dr. Jaeger, plaintiff's treating internist, stated that plaintiff "satisfies all the criteria for

---

ALJ cannot arbitrarily substitute his own judgment for competent medical opinion. *Rosa*, 168 F.3d at 79. A circumstantial critique by a non-physician, however, thorough

or responsible, must be overwhelmingly compelling to justify a denial of benefits. *Wagner v. Secretary of Health & Human Services*, 906 F.2d 856, 862 (2d Cir.1990).

being a full-blown bipolar manic depressive with the specific clinical signs and symptoms as mentioned above." (R. 39).

Additionally, if the ALJ finds that a psychological impairment exists, then the ALJ must consider the combined effect of plaintiff's physical and psychological impairments. 20 C.F.R. § 404.1523. The Regulations require the ALJ to consider all of a claimant's impairments together "without regard to whether any such impairment, if considered separately, would be of sufficient severity" to be disabling. 20 C.F.R. § 404.1523.

In light of these errors, we cannot be certain whether the Commissioner's ultimate conclusion that plaintiff was not disabled is supported by substantial evidence. "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir.1987). "Where application of the correct legal standard could lead to only one conclusion, we need not remand." *Schaal*, 134 F.3d at 504. However, where there are conflicting statements in the record as to certain facts, where significant erroneous assumptions concerning plaintiff's diagnoses and her primary treating physicians were made by the ALJ, where invalid reasons were given for rejecting the opinions of plaintiff's treating physicians, a remand is necessary. It is for the Social Security Administration, not this Court, to weigh the evidence. *Id.* at 504–05.

Plaintiff also argues that the ALJ erred in finding that plaintiff's seizure disorder did not meet the requirements of Listing 11.02. Plaintiff relies on the fact that her seizures occurred more than once a month. The statements in the doctors' reports are conflicting in this regard. (Compare Exh. 34 & R. 38–39 with R. 40 & R. 117).

However, the records are consistent in reporting that plaintiff's seizures are controlled by Dilantin, and plaintiff herself testified that she had not had a seizure for several years at the time of the hearing. Thus, we find substantial evidence in the record to support the ALJ's finding that plaintiff's seizures did not meet the requirements of Listing 11.02, which requires major motor seizures occurring more frequently than once a month, in spite of at least three months of prescribed treatment.

Plaintiff also claims that her depressive disorder met the requirements of Listing 12.04A(1) and 12.04B. As discussed above, Dr. Hampton did provide a medical opinion that the severity of plaintiff's depression met the requirements of section 12.04. (R. 40). On remand, the defendant should reconsider the weight to be given his opinion, as a treating source, in light of all of the medical records in this case. Even if defendant agrees with Dr. Hampton's opinion, Dr. Hampton does not give a date when plaintiff's depression reached a level of severity to meet the requirements of the Listing, which is a matter that will have to be addressed on remand.

## CONCLUSION

For the reasons set forth above, the Plaintiff's Motion for Summary Judgment or, in the Alternative, Motion for Remand [**Doc. # 17**] is GRANTED IN PART AND DENIED IN PART. Defendant's Motion for an Order Affirming the Final Decision of the Commissioner [**Doc. # 19**] is likewise GRANTED IN PART AND DENIED IN PART. The Final Decision of the Commissioner is AFFIRMED with respect to his finding of no disability prior to August 22, 1985. His Decision of no disability for the period August 22, 1985 to February 20, 1990, is REMANDED for reconsideration and further findings consistent with this Opinion. SO ORDERED.